BOARD OF CHURCH EXTENSION

*and*

HOME MISSIONS OF THE CHURCH OF GOD, INC.

*v.*

PERCY EADS, *et al., as Trustees of*

THE GILBOA CHURCH OF GOD

*and*

ROSETTA KING, *as Pastor, etc.*

(No. 13640)

Decided December 21, 1976.

*Timothy N. Barber* for appellants.

*Jackson, Kelly, Holt & O'Farrell, Thomas E. Potter, J.
Randolph Query, Peggy O'Neal Hart* for appellee.

NEELY, JUSTICE:

This case involves a dispute between a national organ of the Church of God and a local congregation. The national organ claims title to local church property through the operation of reverter[1] clauses in the deeds by which the local congregation first came into possession of the church property. The local congregation, defendants below, resisted the claim of the national organ, asserting that the conditions triggering the reverter have not yet been met, or alternatively, that by virtue of *W. Va. Const.*, Art. VI, §47 and *W. Va. Code*, 31-1-79 [1965], both providing that no church can do business in a corporate capacity in the State of West Virginia, plaintiff corporation lacks the capacity to sue. The Circuit Court of Nicholas County found in favor of the plaintiff Board of Church Extension and against the defendants on both questions. We reverse on both questions.

The small town of Gilboa in Nicholas County first organized the Church of God in 1950. Bylaws were adopted and members of the congregation contributed labor and resources to construct a church building on property purchased from a family named Jamison. The conveyance from the Jamisons to the trustees of the newly formed church included the provision:

> "It is understood and agreed that the Trustees of the Gilboa Church of God, and their successors in office, shall have the benefits and privileges of all rights hereunder as long as said church maintains fellowship and doctrinal unity with the General Ministerial Assembly of the Church of God, which meets annually at Anderson, Indiana.

---

[1]We refer to these clauses as "reverters" for convenience; technically, each deed creates an estate in fee simple with an executory limitation creating an interest which takes effect at the expiration of a prior interest. *Restatement, Property* §47 (1936).

"In the event this property falls into disuse, or if in the opinion of said General Ministerial Assembly, the local church at the above address, is no longer in fellowship with doctrinal unity with the Church of God, as represented by its General Assembly, this property shall go to, vest in, and become the property, in fee simple, of the Board of Church Extension and Home Missions of the Church of God, Anderson, Indiana."

In 1964 another conveyance was made to the trustees of the church from Izora Bashaw which involved real estate tangent to the tract in the first conveyance and included the same reverter provision as the 1950 deed. A third conveyance to the defendant trustees of a parcel of real estate tangent to the two parcels involved in this proceeding did not include the reverter provision concerning the General Ministerial Assembly of the Church of God, and, admittedly that property was not at issue in this litigation.

In 1971, the trustees of the Gilboa Church of God conveyed the two properties which are the subject of this action to a straw party who re-conveyed the same properties to the trustees of the Gilboa Church of God without the conditions concerning the General Ministerial Assembly of the Church of God. There is no serious contention by the defendants that this conveyance has any effect upon the outcome of the case.

A succession of various trustees and at least nine pastors served the church from its beginnings until 1969 when Rosetta King became the pastor. This litigation arose because of the activities and beliefs of Rosetta King and the trustees of the church following the year 1969 and up to the time of the filing of the complaint in 1973. At the time of trial the congregation numbered between 75 and 80 parishioners.

The plaintiff contends that Rosetta King, as pastor of the Gilboa Church, at some unnamed time, withdrew herself from doctrinal unity with the national organization and, consequently, denied to a majority of the con-

gregation of the church a place of worship. As a result of this alleged withdrawal from doctrinal unity, the plaintiff claims that the conditions in the two deeds already discussed were met and the title to the properties vested in the plaintiff. Initially the Executive Committee of the West Virginia Ministerial Assembly made the determination that such withdrawal from doctrinal unity had occurred. That determination was embodied in a West Virginia Ministerial Assembly resolution which was forwarded to the Executive Council of the General Ministerial Assembly at Anderson, Indiana. The Executive Council of the General Ministerial Assembly of the Church of God at Anderson, Indiana (which claims to be an agent of the General Ministerial Assembly of the Church of God at Anderson, Indiana) by its resolution, directed the sale of the properties covered by the two conveyances. This law suit was brought by the plaintiff corporation which is associated with the Anderson, Indiana Church of God movement in aid of the Executive Council's resolution for such sale.

The defendants asserted below that the plaintiff is an incorporated church which was prohibited by the statute in effect at the time the action was brought from being qualified to do business in West Virginia and that "doing business" includes both the maintenance of this cause of action and the holding of any property. Defendants also asserted that since the Executive Council of the Church of God, Inc. made the final determination that the Gilboa Church of God was not in fellowship and doctrinal unity with the General Ministerial Assembly of the Church of God, Anderson, the conditions in the two deeds have not been met and the reverter clause is not operative. The defendants demonstrated that the General Ministerial Assembly itself made no findings and adopted no resolution concerning the withdrawal from unity, and further that the General Ministerial Assembly did not ratify, confirm, or adopt the findings or conclusions of the Executive Council of the Church of God, Inc. or similar findings of any other organ of the Church of God, Anderson, Indiana.

The evidence in this case shows that the internal structure of the Church of God is congregational in nature, which gives autonomy in church affairs, including doctrine, to the local churches The Executive Council of the Church of God, Inc. is a creation of the General Ministerial Assembly. The bylaws of the General Ministerial Assembly did not grant that corporation any power to act on behalf of the General Ministerial Assembly concerning the establishment or interpretation of its doctrine or the determination of defection from that doctrine. Although plaintiff argues that there are agency relationships between the West Virginia Ministerial Association, the General Ministerial Assembly, and the Executive Council, there was no evidence of a system of interconnected constitutions and bylaws which would lead the Court to conclude that there was a hierarchical church structure with a generally recognized internal system of conflict resolution.

There was conflicting evidence at the trial concerning whether Rosetta King, as pastor for the Gilboa Church, had turned away from the Anderson, Indiana, movement of the Church of God and embraced the Newark, Ohio, movement of the Church of God. Emphatically, we are not concerned whether she did or did not withdraw from doctrinal unity.

I

The power of the civil courts to interfere with the internal operations of churches is severely limited by the First Amendment to the *Constitution of the United States* as applied to the states by the Fourteenth Amendment, and by *W. Va. Const.*, Art. III, §15. The separation of church and state dictates two distinct approaches to church litigation depending upon whether a given church conforms to a hierarchical church structure where the local churches are connected with and subordinate to the laws, procedures and organs established by the constitution and bylaws of the general church or, alternatively, whether the church is congregational in nature with authority vested in local con-

gregations. *Brady v. Reiner*, 157 W. Va. 10, 198 S.E.2d 812 (1973). The difference in approach is predicated in part on the fact that hierarchical churches have a legal tradition and a system of canon law for conflict resolution within the church which incidentally antedates the common law tradition articulated by the judges of this Court by at least nine hundred years.[2] Therefore it is

---

[2]The origins of canon law can be traced back nearly as far as the origins of Christianity itself. Before the Christian church was recognized by the Roman Empire, church members banded together in *ecclesiae*. *Ecclesiae* were religious societies which often disguised their true function in order to escape persecution by the civil authorities. Gradually a system of law evolved to govern the *ecclesiae* and to settle disputes among their members. This system of law, the earliest antecedent of canon law, was administered by priests. In this respect the Christians followed the earlier example of the Jews, who frequently preferred to have their rabbis adjudicate controversies among believers.

Two significant events markedly increased the influence of church law. First was the Roman Empire's official recognition of Christianity. As Christians emerged from the underground, they brought along their legal system which began to affect the civil law materially. Secondly, the collapse of the Roman Empire in the West left canon law to fill the large legal void created by the collapse. In part, this void prompted the search for the lawbooks of Justinian, which were ultimately rediscovered at the end of the 11th century. Churchmen hoped that these lawbooks would give support to their claim of independence from secular authority during a time when both the ecclesiastical and the secular powers were struggling to gain supremacy over the other. *See*, Berman, *The Religious Foundations of Western Law*, 24 Catholic U. of America L. Rev. 490 (1975).

Over the centuries canon law grew by means of papal decrees, bulls, council resolutions, and other legislative measures. By the eleventh century the large accumulation of these sources prompted efforts to codify and rationalize canon law. Among these efforts were the *Decretum* of Burchard of Worms, the *Collectio Canonum* of Anselm of Lucca, and the *Decretum* of Bishop Ivo of Chartres. The most significant and influential codification, however, was undertaken by Gratian in about 1140. Gratian was assisted by the professors of the first modern law school, which had developed at Bologna and which applied the scholastic method to the law. Gratian's *Concordance of Discordant Canons* was a triumph of scholasticism and a model application of the emerging techniques of reconciling contraditions within, and synthesizing authoritative texts. In 1234 Pope Gregory IX officially sanctified Gratian's work in the

not unreasonable that, with regard to disputes within hierarchical churches, civil courts should respect, and where appropriate enforce, the final adjudications of the highest church tribunals, provided that such adjudications are not procured by fraud or collusion, *Watson v. Jones,* 80 U.S. (13 Wall.) 679, (1871); *Serbian Eastern Orthodox Diocese For The United States of America And Canada v. Milivojevich,* 426 U.S. 696, (1976).

The problems of church litigation become more complicated in churches with congregational structures because the civil courts are unable to rely upon the integrity of a well developed and time tested system of canon law. Two hundred years of religious strife in Britain beginning in the reign of Henry VIII and mercifully

---

*Decretum of Gratian.* Canon law was reedited in 1582 at the command of Pope Gregory XIII, who entrusted the task to a commission of cardinals and learned scholars of law. Their product, the *Corpus Juris Canonici* formed the basis of modern canon law until its displacement in 1917 by the *Codex Juris Canonici.*

In connection with the development and influence of canon law it is interesting to note that during the Middle Ages church courts asserted a jurisdiction and competence in matters ranging far beyond the spiritual. In fact much of what today is civil law was practiced during the Middle Ages in church courts. All of domestic relations, marriage, divorce, and guardianship was within the jurisdiction of church courts. Canon law was equally concerned with property matters, including the succession of property, both testate and intestate, "uses," the forerunners of modern trusts, probate of wills, and the administration of estates. Canon law also was deeply involved with contracts where the promise had been supported by an oath, or where the discharge of the obligation involved good faith, arising from a pledge of faith, and with economic regulation including wage and price controls, banking, and finance, particularly with respect to usury. Church courts even had a wide criminal jurisdiction, because a crime could be both a temporal offense and a sin. When a crime was a sin, church courts placed great emphasis on the criminal's intent, and in punishment, sought to secure the criminal's repentence. Thus the modern concepts of *mens rea* and rehabilitation of criminals have their roots in canon law.

In light of church courts' background, experience, and historical tradition, it is not difficult to understand why their decisions are still today entitled to great weight and respect by civil authorities.

concluding during the reign of William III[3] have instructed the civil courts that intervention in church controversies is a sticky wicket at best; however, the same bloody history also teaches that church controversies, where left unresolved, will ultimately lead to civil strife, riots, and violence. In disputes within congregational

---

For a good general discussion of the development and influence of canon law, *see*, R. Wormser, *The Story of the Law*, (rev. ed. 1962).

[3]Students of English history are well aware of the religious strife in England during this turbulent period. In about 1520, during the reign of Henry VIII, the heretical ideas of Martin Luther began to spread in England. Henry VIII, at that time clinging to Catholic orthodoxy, wrote the *Defense of the Seven Sacraments* in response, and for his efforts, was named by the pope "Defender of the Faith." Soon thereafter, however, the pope refused Henry VIII's request to annul his marriage to Catherine of Aragon, which had failed to produce a male heir to the throne. This rebuff caused Henry VIII to break with the Roman Catholic Church and to install his own compliant Archbishop of Canterbury as head of the English church. Parliament cooperated in Henry's scheme by passing in 1534 the Act of Supremacy, declaring that English kings, and not popes, were to be the heads of the church and clergy in England. An early and prominent victim of this religious upheaval was Sir Thomas More, who was executed for his refusal to acknowledge Henry VIII's supremacy in church affairs.

Henry VIII tried to maintain the viability of England's separate Catholic church, but it became clear that his break with the Roman church allowed the Protestant reform movement to gain strength in England. With the growth of Protestantism the religious division of England accelerated during the brief reign of Henry's successor and son, Edward VI, from 1547 to 1553. Mary, the daughter of Catherine of Aragon and a devout Roman Catholic, succeeded to the English throne in 1553, on Edward VI's death. She tried to re-Catholicize England, and in the process burned heretics at the stake in the only such public executions England ever witnessed. She further exacerbated tensions in the country by marrying Philip of Spain, who was king of one of Europe's most intensely Catholic countries.

Under Elizabeth, who succeeded Mary in 1558, a Protestant Church of England was finally, and firmly, established. This development was inevitable, since Elizabeth, who was illegitimate in the eyes of Catholics, could not successfully rule in a Catholic country. Anglican Church doctrine was promulgated by the crown, acting through Parliament, and all English subjects were obligated to belong to the established church. Nonbelievers and heretics could be identified on both extremes of the religious spectrum: tradition-

al Catholics who did not accept the Anglican usurpation, and radical Calvinists who felt the Anglican Church had stopped short in its Protestant reform impulse. Such nonconformists were labeled "recusants," who were compelled to accept the Anglican Church supremacy by the High Commission, a religious enforcement agency established by Elizabeth.

James I succeeded Elizabeth in 1603, and was himself succeeded by his son, Charles I, in 1625. These two Monarchs staunchly supported the Anglican Church, and as a consequence, came into conflict with an increasingly puritan Parliament. In 1637 the Scots rebelled against Charles' efforts to impose the Anglican religion in Scotland. Parliament refused to support the king against Scotland, and in 1642 open war broke out between the king and Parliament. To gain Scotland's support in its struggle with the crown, Parliament passed the Solemn League and Covenant, which had the effect of establishing Presbyterianism in Great Britain. Charles was defeated by the Parliamentary forces led by Oliver Cromwell, a devout Puritan, and executed. After the execution, a republic was established, with limited religious toleration. Nonetheless religious strife continued unabated, especially in Ireland, where thousands of Catholics were killed.

Moral puritanism was imposed on the country through Cromwell's Lord Protectorate, essentially a political dictatorship. Two years after Cromwell's death in 1658, royalty was restored and Charles II took the throne. The primacy of the Anglican Church was also restored at this time, and Puritan elements took on the new identity of Dissenters. Numerous laws were passed, restricting the Dissenters in the exercise of their religious beliefs. Charles II suspended the enforcement of these laws in his declaration of indulgence. Parliament feared that the king's declared religious toleration could provide an opening in England for the Counter-Reformation, which was then gathering momentum in Europe. In response, Parliament passed the Test Act in 1673, which substantially reenacted the laws against Dissenters.

Catholic-Anglican tension was significantly increased when James II, brother of Charles II, took the throne in 1685. James II, who had earlier converted to Roman Catholicism, promoted religious toleration, increased Catholics' influence in the government, and in general, threatened the Anglican monopoly of church and state. In 1688, a son was born to James II, and baptized a Catholic. This raised the prospect of England's being ruled by a continuing line of Catholic monarchs, and brought on the Revolution of 1688. Parliament offered the throne to Mary, James II's grown daughter, and her Dutch husband, William of Orange. The reign of William and Mary ushered in an era of comparative religious stability in England. Helping quiet religious strife during this period were the Toleration Act of 1689, granting a measure of relief to Dissenters; the Act of Settlement of 1701, which eliminated one source of religious tension by providing that no Catholic could be King of En-

churches civil courts at some point must make an adjudication of rights[4] without the assistance of a respected system of conflict resolution within the church.

Where courts are called upon to perform this function there is inevitably generated a tension between the resolution of disputes and the separation of church and state because the legal reasoning process of courts is inherently result oriented. Notwithstanding protestations on the part of countless thousands of appellate judges during the course of numerous centuries, legal reasoning in complex cases inevitably works backward from the result to the rule rather than from the rule to the result. For example, "substantial compliance," "intention of the drafters," "clear and unambiguous," "unconscionability," and "constructive fraud" are all legal phrases which can be used selectively to arrive at any given result which suits the fancy of the court.[5] It is no new insight to recognize that it is tradition and reason which protect our rights and not the elastic rules of law. No rule determines its own application.

---

gland; and the formation of the United Kingdom of Great Britain in 1707, which removed the threat that a Stuart, Catholic regime could be reestablished in formerly independent Scotland.

While this explanation is not intended as either a sophisticated or exhaustive historical analysis, it should suffice to demonstrate the memories of religious involvement which were still strong to the drafters of the First Amendment. For a good general discussion of this era, including details of religious turmoil in other European countries, *see*, R. Palmer and J. Colton, *A History of the Modern World*, (3d ed. 1965).

[4] For the preeminent discussion in another context of the policy behind noninvolvement of civil authorities in church affairs *see*, *Meek v. Pittinger*, 421 U.S. 349 (1974).

[5] Such principles as those cited in the text lend themselves well to the rule-selection process often used to justify given results. Jurists enrich their lexicon by fashioning new maxims to meet new circumstances, and in so doing they continue an age-old tradition. Take for example the old, but familiar *"sic utere tuo ut alienum non laedas."* The Supreme Court of Tennessee recognized the result-oriented nature of this maxim in *Payne v. Railroad Company*, 81 Tenn. 507 (1884):

" ... the maxim *'sic utere tuo, ut alienum non laedas'* ... is doubtless an orthodox moral precept; and in the law, too, it finds frequent application to the use of surface and running water, and indeed generally to easements and servitudes. But strictly, even then it can mean only: 'So use your own that you do no legal damage to another's.' Legal damage, actionable injury, results only from an unlawful act. This maxim also assumes, that the injury results from an unlawful act, and paraphrased means no more than: 'Thou shalt not interfere with the legal rights of another by the commission of an unlawful act;' or 'Injury from an unlawful act is actionable.' This affords no aid in this case in determining whether the act complained of is actionable, that is, unlawful. It amounts to no more than the truism: An unlawful act is unlawful. This is a mere begging of the question; it assumes the very point in controversy, and cannot be taken as a *ratio decidendi*." *Id.*, at 527.

Like sentiments have been expressed by the English Bench. In the case of *Brand v. Hammersmith and City Railway Co.*, 2 Q.B. 223 (1867), Sir W. Erle laid the problem bare in his observation:

"The maxim, *'sic utere tuo ut alienum non laedas,'* is no help to decision, as it cannot be applied till the decision is made ... " *Id.* at 247.

For a modern view of this problem, *see* Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes are to Be Construed,* 3 Vand. L. Rev. 395 (1950). That article lists 28 principles of statutory construction along with the corresponding counter-principles. The following four examples, excerpted from the article, illustrate some aspects of the operation of the rule-selection process.

1. A statement cannot go beyond its text.

1. To effect its purpose a statute may be implemented beyond its text.

6. Statutes *in pari materia* must be construed together.

6. A statute is not *in pari Materia* if its scope and aim are distinct or where a legislative design to depart from the general purpose or policy of previous enactments may be apparent.

18. Words are to be interpreted according to the proper grammatical effect of their arrangement within the statute.

18. Rules of grammar will be disregarded where strict adherence would defeat purpose.

Judges cannot and should not permit the courts to be used for the vindication of any religious viewpoint, yet the techniques of normal civil litigation lead inevitably to that result because of the potential for abuse in the rule selection process. Therefore, unless a court can apply a completely neutral principle of law unsusceptible to the result-oriented rule selection process, a civil court must stay its hand, decline to intervene, and leave the matter in whatever *status quo* the machinations of the church itself have brought it. While absolutist approaches under the First Amendment may also be result-oriented, the result sought to be achieved is the general one of non-intervention and non-regulation, rather than specific results in specific cases.[6]

---

| | |
|---|---|
| 20. Expression of one thing excludes another. | 20. The language may fairly comprehend many different cases where some only are expressly mentioned by way of example. |

[6]*Serbian Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976), culminates a line of U.S. Supreme Court cases which restrict civil courts to the application of neutral principles in resolving religious controversies. Before stating the current law, *Serbian Orthodox Diocese* surveys the historical development of First Amendment limitations on civil courts. While the survey was intended to place the *Serbian Orthodox Diocese* holding in its proper context, the survey is equally helpful in illuminating this Court's decision in the *Board of Church Extension* case.

The first major U.S. Supreme Court case in this area was *Watson v. Jones*, 80 U.S. (13 Wall.) 679 (1871). The basic principle established by *Watson* was that:

> "the rule of action which should govern the civil courts ... is, that, whenever the questions of discipline, or of faith or ecclesiastical rule, custom, or law have been decided by the highest of these church judicatories to which the matter has been carried, the legal tribunals must accept such decisions as final, and as binding on them, in their application to the case before them."
> *Id.* at 727.

A later case, *Gonzalez v. Archbishop*, 280 U.S. 1, 74 L.Ed. 131, 50 S.Ct. 5 (1929), put a gloss on the *Watson* rule which produced some conflusion only recently cleared up by *Serbian Orthodox Diocese*. The Court in *Gonzalez* stated:

"In the absence of fraud, collusion, or arbitrariness, the decisions of the proper church tribunals on matters purely ecclesiastical, although affecting civil rights, are accepted in litigation before the secular courts as conclusive, because the parties in interest made them so by contract or otherwise." *Id.* at 16.

References to the suggested "fraud, collusion, or arbitrariness" exception appeared in later cases including *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94 (1952), *Presbyterian Church v. Hull Church*, 393 U.S. 440 (1969), and *Md. & Va. Churches v. Sharpsburg Church*, 396 U.S. 367, (1970) (Brennan, J., concurring). *Serbian Orthodox Diocese* correctly points out, however, that the exception suggested in *Gonzalez* to permit marginal civil court review of ecclesiastical decisions was only dictum. In fact, the *Gonzalez* decision states that there was "not even a suggestion that [the Archbishop] exercised his authority arbitrarily." *Id.*, at 18. Likewise, later references to the "fraud, collusion, or arbitrariness" exception were dictum. *See, e.g. Presbyterian Church v. Hull Church,* 393 U.S. 440, 21 L.Ed.2d 658, 89 S.Ct. 601 (1969), which states: "We have no occasion in this case to define or discuss the precise limits of review for 'fraud, collusion, or arbitrariness' within the meaning of *Gonzalez.*" Thus did a questionable legal principle enter our jurisprudence untested by application to actual facts and only barely examined as to its merit. *See, e.g., Brady v. Reiner,* 157 W. Va. 10, 198 S.E.2d 812 (1973) which is hereby expressly overruled to the extent that its incorporation into West Virginia jurisprudence of the *Gonzalez* exception is inconsistent with this opinion.

The *Serbian Orthodox Diocese Court* had before it only the "arbitrariness" portion of the *Gonzalez* exception, and it concluded, after reviewing the earlier decisions, that civil courts may not, because of First Amendment constraints, undertake an inquiry into the "arbitrariness" of ecclesiastical actions. To do so must:

"... inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly require the church adjudicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits; recognition of such an exception would undermine the general rule that religious controversies are not the proper subject of civil court inquiry, and that a civil court must accept the ecclesiastical decisions of church tribunals as it finds them." *Serbian Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 49 L.Ed.2d 151, 96 S.Ct. 2372 (1976).

This Court wholeheartedly endorses the above-cited formulation and emphatically announces its intention to accept church decisions "as it finds them" whenever a case is not susceptible to the application of completely neutral principles of law.

In litigation involving congregational churches courts are frequently called upon to resolve property disputes based upon language in deeds. In this case we are confronted with a reverter clause which is plain and unambiguous; If it were ambiguous, we could not construe it but would be required to decline jurisdiction. Here, however, the deed clause provides that;

> "[I]n the event this property falls into disuse, or if in the opinion of said General Ministerial Assembly, the local church at the above address, is no longer in fellowship and doctrinal unity with the Church of God, as represented by its General Assembly, this property shall go to, vest in, and become the property, in fee simple, of the Board of Church Extension and Home Missions of the Church of God, Anderson, Indiana."

Accordingly, the reverter provision requires the opinion of the General Ministerial Assembly—nothing more and nothing less. In this case the General Ministerial Assembly cannot delegate that function by agency because a civil court would then be required to construe whether it were the intention of the grantor to permit such an agency relationship. The General Ministerial Assembly must render an opinion, and must evidence that opinion in some generally recognized form such as a resolution. It is not for us to inquire whether the opinion is correct, whether the opinion is arbitrary, whether the opinion is justified, or anything else about the opinion except that it has been procured without fraud or coercion. If the deed had required that at the same time that the opinion were rendered five hundred white doves must be released into the open air, then the trial court would be required to find as a matter of fact that exactly five hundred white doves had indeed been released, no more and no less. In church litigation four hundred and ninety-nine doves would not suffice under the doctrine of substantial compliance.

Consequently, as the resolution of the Executive Council of the Church of God, Inc. was not in the literal sense an opinion of the General Ministerial Assembly, a

neutral reading of the reverter clause in the deed means that there has not been literal compliance with the provision of the deed. Thus the cause of action must fail upon the merits.

## II

While it is not necessary for the resolution of this dispute, the question concerning the capacity of the corporate plaintiff to bring this action and to hold the church property is fairly raised, and should be adjudicated to provide guidance for future litigation in this matter should it arise. *W. Va. Const.*, Art. VI, §47 provides that no charter of incorporation shall be granted to any church or religious denomination. Similarly, *W. Va. Code*, 31-1-79, [1965] in effect at the time of this proceeding provided that: (1) no church can do business in a corporate capacity as an out-of-state corporation; (2) no corporation can hold property or maintain any action, suit, or proceeding without qualifying to do business in West Virginia; (3) failure to qualify may be used as a plea in abatement against any such corporation which attempts to sue in West Virginia; and (4) a cause of action arising out of the holding of property or transacting business is specifically included among those causes of action to which a plea in abatement will lie.

The evidence in this case indicates that the plaintiff Board of Church Extension and Home Missions, Inc. is directly responsible to the General Assembly of the Church of God and has general responsibility in the area of home missions work among American Indians and minority groups that it makes loans to congregations who are building; that it takes care of conditional deeding of church property; and, that it has responsibilities in the area of evangelism and building fund campaigns.

This Court recognizes that there is conflict among the authorities cited by the parties on the question of whether the plaintiff corporation is a "church" within

the meaning of *W. Va. Const.*, Art. VI, §47, and acknowledges that the problem of definition is not one that lends itself to an easy solution. A careful reading of precedent does, however, lead this Court to the conclusion that the plaintiff corporation is a "church" within the meaning of the relevant constitutional provision. In the early case of *Wilson v. Perry*, 29 W. Va. 169, 1 S.E. 302 (1886), an auxiliary organization of the Presbyterian Church, The Trustees of the Presbyterian Committee of Publication, was held legitimately to have assumed corporate form. *Wilson*, however, differs significantly on its facts from the present case. First, The Trustees of the Presbyterian Committee of Publication was a quasi-commercial publication enterprise, and in that respect very much unlike the Board of Church Extension and Home Missions. Secondly, the issue in *Wilson* was whether the bequest of a West Virginia decedent to the Committee of Publication, incorporated in Virginia, was void because of the uncertainty of the beneficiaries. By holding that the Committee of Publication was legitimately a corporation, the *Wilson* Court was able to give effect to the intention of the grantor. In reaching this result, the Court relied heavily upon Virginia's sanction and approval of the Committee of Publication's incorporation in that state. This acquiescence in Virginia's interpretation of its own law might imply that West Virginia would follow suit when called upon to pass on the legitimacy of a similar West Virginia corporation, since the constitutional provisions of both states on this point were identical. Nevertheless, *Wilson* left the door open for West Virginia's taking a different approach when the proper case was presented.

The opportunity for a more definitive reading of West Virginia law arose in the later case of *Powell et al. v. Dawson*, 45 W. Va. 780, 32 S.E. 214 (1899). By instituting a mandamus action to compel the Secretary of State to issue a charter of incorporation to the Baptist Missionary Society of West Virginia, this Baptist group squarely presented a case in which the scope of *W. Va. Const.*, Art. VI, §47 could be determined. The Court held that

because of West Virginia's constitutional provision the Secretary of State could not be compelled to issue the charter of incorporation, and pointed to three activities of the Baptist Missionary Society which influenced the Court's decision. These activities were the "aiding in the support of Baptist ministers engaged in preaching the gospel"; the giving of "aid in the erection of houses of worship in missionary fields"; and the "collecting and disbursing funds for these [two] purposes." In these respects the Baptist Missionary Society very much resembles the Board of Church Extension, and accordingly, this Court feels that *Powell* must control the outcome of the present case rather than *Wilson.* Similarly the case of *Stump v. Sturm,* 254 F. 535 (1919) cited by the plaintiff is either not on point or is incorrect. To the extent that *Stump v. Sturm* provided that the State alone could challenge the validity of a church corporation's holding land, the law on which it is based has been changed in that the statute applicable to this case provided for a plea in abatement by a private party. To the extent that *Stump v. Sturm* is inconsistent with the holding of this case it was an incorrect interpretation of West Virginia law by a federal court.

We find that the plaintiff is an organization directly involved in religious work and that its primary purpose is to create and work with churches. Consequently it is within the purview of our constitutional and statutory provisions prohibiting churches from carrying on their activities in corporate form.

The plaintiff asserts a constitutional infirmity in our statute denying access to the courts to non-qualifying non-resident corporations and cites *Allenberg Cotton Co. v. Pittman,* 419 U.S. 20, (1974) which held that a Mississippi statute similar to our own was unconstitutional as a violation of the commerce clause of the *Constitution of the United States.* The *Allenberg Cotton* case included an exhaustive analysis by Mr. Justice Douglas of the interstate nature and commercial characteristics of the plain-

tiff's business and concluded that a state statute precluding access to state courts based on failure to qualify to do business was an unwarranted burden on interstate commerce. In the case before us, however, it would be blasphemous to characterize the operations of any church as "commerce" such as to bring the operations within the purview of the interstate commerce clause. We are concerned not with a business but with a church, and since the State may reasonably prohibit a church from doing business in corporate form, it may similarly deny access to its courts to a religious corporation which is operating within its territory in contravention of its constitutionally announced public policy.

For the foregoing reasons the judgment of the Circuit Court of Nicholas County is reversed and the case is remanded with directions to dismiss the action.[7]

> *Reversed and remanded*
> *with directions to*
> *dismiss the action.*

CAPLAN, JUSTICE, *concurring:*

While I concur in the result reached by the majority, I would not have overruled any part of *Brady v. Reiner*, 157 W. Va. 10, 198 S.E.2d 812 (1973). I believe it is improper to overrule a case in a footnote, it being my thought that if such action is to be taken, it should be done in the body of the opinion. Furthermore, I would not have encumbered the opinion with what I consider unnecessary dicta.

FLOWERS, JUSTICE, *dissenting:*

I respectfully dissent to the holding of the majority in this case. Having carefully examined the majority writer's footnotes and the opinion attached thereto, I find my objections to be rather comprehensive, going to both the substance and form of the opinion.

---

[7]We have reviewed the defendants' contention that the reverter clause in the subject deeds violates the rule against perpetuities and find it without merit.

In matters of substance, the majority has reversed a trial court without any conclusion that its factual findings were clearly wrong, has impermissibly and unconstitutionally muddled the law as to the rights of churches, and has incredibly reached a decision on the merits of the case and then concluded that the litigant was disqualified from bringing the suit in the first place.

As to form, the opinion deals casually with important and controlling precedent, overruling at least part of the leading West Virginia authority deep within a lengthy footnote, and disposes of points of error in the same fashion. Further, in citing the *West Virginia Code,* the year "1965" is inserted after numerals indicating a code section. The *West Virginia Code* of 1931, as amended, is the official codification of the statutes of this State, and a "1965" code will not be found by even the most diligent researcher.

More serious and significant than the differences as to form are the deficiencies in the substance of the majority opinion.

First, the majority has reversed the factual findings of the trial court without a precedent determination that they are clearly wrong. Rule 52 of the West Virginia Rules of Civil Procedure; *Lewis v. Dils Motor Co.,* 148 W. Va. 515, 135 S.E.2d 597 (1964). This Court has consistently accorded a lower court special respect due to its unique position in having seen and heard the witnesses. *State Farm Mutual Automobile Ins. Co. v. American Casualty Co.,* 150 W. Va. 435, 146 S.E.2d 842 (1966).

The findings of fact and conclusions of law made by the patient and able trial judge are correct. It is error for this Court to dismiss such findings simply because an examination of the record will support an alternate conclusion.

Next, the majority concludes that the Church of God is not a hierarchical church, therefore, it is not entitled to the freedom to direct its own affairs which it would

otherwise enjoy. This is contrary to the plain import of *Brady v. Reiner*, 157 W. Va. 10, 198 S.E.2d 812 (1973), and is an impermissible and unconstitutional excursion by the judicial branch of the State into affairs properly belonging to the church.

> "* * * Religious freedom encompasses the 'power [of religious bodies] to decide for themselves, free from state interference, matters of *church government* as well as those of faith and doctrine.' *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 116." Syllabus Point 2, *Serbian Eastern Orthodox Diocese v. Milivojevich*, 44 U.S.L.W. 4927, 4928 (U.S. June 21, 1976). (emphasis added)

This is not the usual church property dispute. The question here is not "Who will get the property?". We know who will get the property. The only factors which we do not know are when and how the plaintiff will gain title. The deed specifically names the plaintiff as the recipient of the property upon the occurrence of an event. That event, the cessation of "fellowship and doctrinal unity with the Church of God * * *" at Anderson, Indiana, has occurred. No one can very solemnly contend that it has not. The intention of the local congregation was uncontrovertably demonstrated when they sought to unilaterally relieve themselves of the reverter clause in the deed through a straw party transaction.

The majority does not very vigorously contest this. They say simply that since the Church of God is not an hierarchical church, we must use the "500 white doves" theory and require that body to operate in a way which this court understands and approves. We have no such authority. Both recent and historic precedent forbid our entry into such dictation to religious bodies.

> " "* * * [T]he [First] Amendment * * * commands civil courts to decide church property disputes without resolving underlying controversies over religious doctrine.' *Ibid.* This principle applies with equal force to church disputes over *church*

> *polity and church administration." Serbian Eastern Orthodox Diocese v. Milivojevich, supra* at 4931. (emphasis added)

Here the Church of God established, to the satisfaction of the trial judge and at least a minority of this Court, that their own procedures call for all matters of church property to be handled by the Executive Council.

That procedure was followed and the plaintiff, Board of Church Extension, was instructed to bring this suit. The Executive Council operates as the business arm of the General Assembly. The General Assembly considers no resolutions or business matters but the majority of this Court would instruct them to change that. Though the Church of God authored the reverter clause used here and tailored it to their own way of administering church affairs, the majority has denied them the protection of our courts because they are held not to qualify as "hierarchical."

> "The *form of church polity or government*, the ecclesiastical law regarding property, the discipline, customs and usages of a church, written or not, are vital integral parts of doctrine, the interpretation of which is forbidden to the civil courts by the West Virginia and United States Constitutions." Syllabus Point 6, *Brady v. Reiner*, 157 W. Va. 10, 198 S.E.2d 812 (1973). (emphasis added)

Finally, the majority writer diffidently relies upon the disqualification of the plaintiff as a litigant to reinforce his conclusion on the merits. We are told that this element is "not necessary for the resolution of the dispute" but its adjudication will "provide guidance for future litigation . . . " Such an adjudication, however, renders a decision on the merits superfluous persiflage. An appellate court should not decide questions immaterial to a proper disposition of the case. *House v. Universal Crusher Corp.*, 115 Va. 558, 79 S.E. 1049 (1913). *See Muldoon v. Kepner*, 141 W. Va. 577, 91 S.E.2d 727 (1956); *Smith v. City of Bluefield*, 132 W. Va. 38, 55 S.E.2d 392 (1948).

Nevertheless, we are told that the plaintiff, Board of Church Extension, may not maintain this suit because it is a "church" and because it is a nonqualified foreign corporation.

The ingredients which make the Board of Church Extension a church in the eyes of the majority are that it "is directly responsible to the General Assembly of the Church of God"[1], "has general responsibility in the area of home missions and work among American Indians and minority groups ... makes loans to congregations who are building ... takes conditional deeding of church property; and ... has responsibilities in the area of evangelism and building fund campaigns."

The Board of Church Extension is no more a "church" than the PTA is a school. The Board is a supporting auxiliary organization which a more careful reading of *Wilson v. Perry*, 29 W. Va. 169, 1 S.E. 302 (1886), will substantiate. If the Board of Church Extension went out of "business"—and I use the latter characterization without fear of blasphemy as suggested by the majority—no one in the Church of God would be without a place to worship. In the essentials of their church life, no member identified with the Church of God anywhere in the world, would be without a "church" for even one Sunday.

This Court at an early date will have to reconsider this definition or else exclude from our courts generally the charitable, educational and business activities that in corporate form are pursued by all the major religious denominations within our boundaries. The only fortunate thing about the conclusion of the majority on this point is that it renders dicta its earlier conclusions on the merits.

The majority licenses their attack upon the plaintiff corporation by adherence to *Powell v. Dawson*, 45 W. Va.

---

[1] The Board, however, is apparently not sufficiently "responsible" to the General Assembly for the majority to conclude that an "hierarchy" exists.

780, 32 S.E. 214 (1899). If *Powell* is a correct statement of the law, it is clearly distinguishable. *Stump v. Sturm,* 254 F. 535 (4th Cir. 1919), is not an incorrect interpretation of West Virginia law by a federal court.

The majority afflicts the plaintiff with the further plague of not being qualified to do business in the State at the time when suit was brought. This is an easily cured defect for one who has not already been disqualified as a "church" and is a "defect" which the statute has now removed from being a bar to judicial access in West Virginia. *W. Va. Code,* 31-1-49(b)(1), as amended. Under Section 49, the maintenance or defense of a legal action is not considered doing business in the State. Its enactment was subsequent to the judgment rendered by the trial court but prior to our consideration and decision of this appeal. An appellate court should apply the law in effect at the time it renders its decision, unless doing so would result in manifest injustice or constitute a departure from the mandates of statutory direction or legislative history. *Bradley v. School Board,* 416 U.S. 696, 40 L.Ed.2d 476, 94 S.Ct. 2006 (1974).

> " ... [I]f subsequent to the judgment and before the decision of the appellate court, a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied. ... [T]he Court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside." *United State v. Schooner Peggy,* 1 Cranch 103, 110 (1801).

Thus, there is no legal mandate to force the plaintiff's obedience to the former law.

Like the thrashing wind from the ascendancy of his "500 white doves," the majority writer has disrupted principles of church law which have been carefully moulded in that historic era between William III, King

of England (1702) and Rosetta King of Gilboa (1975)—an era to which the author pays scant attention. Rather than trusting that the "white dove" principle has become the guiding church law of West Virginia, I would commend continued reliance upon the thorough and well-reasoned opinion of former Chief Justice Haden in *Brady v. Reiner, supra,* and I would dedicate the majority opinion herein to the general animal species used to illustrate its rationale.

I am authorized to state that Chief Justice Berry joins in this dissenting opinion.