The BISHOP AND DIOCESE OF COLORADO, a Colorado non-profit corporation, the Reverend Charles Larry Day, Allen Uyeda, Robert Douglass, H. David Huskin, Harry Thom, John Brown, Joseph Esch, Carla Parnell, Mildred Mullenax, John Helmore, Otis Drury, Marian Lattimore, as members of the Vestry of the Episcopal Parish of St. Mary's, the Episcopal Parish of St. Mary's, and Episcopal Church of St. Mary, Plaintiffs-Appellees,

v.

The Reverend James O. MOTE, John Archibold, Marvin Olsen, John Brainerd, Wayne Gill, Chris Woodbury, Richard Atchison, Charles Buell, Rick Hill, Walter Kulp, James Lucero, Lorne Scofield, and Saint Mary's Church, a Colorado non-profit corporation, Defendants-Appellants.

No. 80CA0406.

Colorado Court of Appeals, Div. III.

Jan. 13, 1983.

Rehearing Denied Feb. 24, 1983.

Certiorari Granted Aug. 22, 1983.

Fishman, Geman, Gersh & Bursiek, P.C., Miles M. Gersh, Holland & Hart, Denver, for plaintiffs-appellees.

Skelton, Oviatt & O'Dell, Forrest C. O'Dell, Wheat Ridge, for defendants-appellants.

John E. Archibold, Denver, defendant-appellant pro se.

BERMAN, Judge.

This is an appeal from a judgment granting legal title to St. Mary's Church to the minority of its members upon a split of the parish. We reverse.

St. Mary's Church was established as a mission within the Protestant Episcopal Church of the United States of America (Episcopal Church) in the early 1930's, and was incorporated under the laws of the State of Colorado in 1934. Twenty years later the mission of St. Mary's sought and obtained parish status from the Colorado Diocese of the Episcopal Church. As a condition of the parish status, St. Mary's unanimously adopted a resolution acceding to the constitutions of the national church and the Diocese, and promising obedience to the national church's canons and to the canons of the Diocese. Its articles of incorporation were amended to reflect the same accession. St. Mary's also adopted corporate by-laws which, in an article captioned "accession," provided that "the parish shall have control of its own local affairs but nothing shall be done which conflicts with the Canons of the Church, either General or Diocesan."

Beginning in the early 1970's, a number of doctrinal controversies arose within the Episcopal Church. Among these controversies was whether women should be ordained to the priesthood.

The General Convention of the Episcopal Church formally approved the ordination of women in 1976. Two months later, at the Annual Convention of the Diocese of Colorado, the St. Mary's delegation presented a resolution calling upon the Diocese to withdraw from the Episcopal Church in protest to the ordination of women priests. When the convention rejected the resolution, Fa-

ther Mote, the rector of St. Mary's, announced that he could no longer be a member of the Episcopal Church and walked out of the convention, along with most of the members of the St. Mary's delegation. Upon Mote's failure to retract his public declarations, he was removed by the Bishop from the ministry of the Episcopal Church.

The dissident majority, including Mote, voted to secede from the Episcopal Church. They amended the articles of incorporation to reflect the secession.

About the same time as the majority's secession, the Bishop met with the minority of St. Mary's members still loyal to the church. He formally recognized this minority as representing St. Mary's parish. These individuals have since been meeting in quarters rented from another Denver church, while the majority continues to occupy the original St. Mary's building. The Diocese of Colorado then adopted a resolution declaring that it "does not approve or recognize the action taken by St. Mary's Church to withdraw from the Diocese of Colorado, supports those members of St. Mary's Church who voted against such withdrawal and affirms its ecclesiastical ties and its rights with respect to the non-profit corporation known as St. Mary's Church."

Because the secessionist majority considered themselves possessed of the property of St. Mary's Church, the Bishop of the Colorado Diocese of the Episcopal Church, the Colorado Diocese, and the members of St. Mary's Church loyal to the Episcopal Church sued to recover possession of all real and personal property held by the majority. The trial court held that the minority was entitled to the property. It considered it necessary to defer to the decision of the Diocese which recognized the minority faction as the "true" Saint Mary's Church because it found that the Episcopal Church was hierarchical as to both doctrinal and temporal matters. The trial court explained in its findings that deference was "necessary" because high church officials had testified that the ownership of local parish property was a matter of church "polity." In this regard the court stated: "The evidence showed that the Executive Council of the Diocese of Colorado and the Bishop of Colorado considered the issues in the St. Mary's controversy to be fundamental to the integrity of the polity of the Episcopal Church." Accordingly, it ordered the majority to surrender control of all real and personal property held in the name of St. Mary's Church, and the majority appeals.

The appellants argue that the trial court need not have deferred to the diocesan decision as to property ownership. They maintain that if a "neutral principles of law" approach is applied, they are entitled to possession. We agree.

Judicial review of the internal affairs of church organizations has long been a subject of intense debate. Whenever a court is called upon to settle church property disputes, the spectre of the First Amendment freedom of religion and establishment clauses is raised. For fear of excessive entanglement in church affairs, the courts have long struggled with where the line is to be drawn between disposing of the matter as a civil property dispute and deferring to church polity. This question has largely been settled by the case of *Jones v. Wolf,* 443 U.S. 595, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). However, for the sake of completeness, and because we believe that a short disposition on the history of the judicial debate may be helpful in our future application of *Jones,* we begin with an exegesis.

The seminal Supreme Court decision concerning judicial review of disputes over church property is *Watson v. Jones,* 80 U.S. (13 Wall) 679, 20 L.Ed. 666 (1871). In *Watson,* the Court divided church property disputes into three categories. In the first category, if the local church property has been dedicated to the church subject to express conditions of trust, a court must enforce those conditions. Secondly, if the property is held by a congregational church, *i.e.,* one that is not subject to decisions from higher authority within a church hierarchy, then a majority of the church members may control the disposition of the property. In

the third category, if the property is held by a local church under the control of a hierarchical organization, courts must defer to the appropriate church tribunal's resolution of any question of religious doctrine upon which the settlement of the church property dispute depends.

This third category has been variously labeled the "polity" or "compulsory deference" rule. It was applied to settle the dispute in *Watson* because the deed to the property as well as the charter of the local church "subjected both property and trustees alike to the operation [of the general church's] fundamental laws." *Watson* at 683.

Because the compulsory deference doctrine announced in *Watson* allows a hierarchical church almost unlimited power over its local churches, later decisions have imposed minimal fairness requirements on the management of local property by such churches. *See, e.g., Gonzales v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 50 S.Ct. 5, 74 L.Ed. 131 (1929).

The "neutral principles" approach first appeared in *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969). *Presbyterian Church* presented a hierarchical church dispute between a general church and two of its local member churches over the right to use the local churches' property. The schism arose because the local churches claimed that the general church had violated the organization's constitution. At the time, Georgia law implied a trust of local property for the benefit of the general church on the condition that the general church adhere to church doctrine as it existed at the time of affiliation of the local churches. Because the jury found that the general church had abandoned its original doctrines, the Georgia Supreme Court upheld the right of the local congregations to withdraw and to maintain possession of the local property.

The Supreme Court held that such a civil court inquiry into whether the general church had departed from doctrine was improper because such questions are matters of purely ecclesiastical concern. The court remanded with instructions to avoid "resolving underlying controversies over religious doctrine." And, for the first time, the Supreme Court stated that "neutral principles of law, developed for use in all property disputes," should be applied by civil courts when faced with church property disputes. On remand, the Georgia Supreme Court concluded that, without the departure-from-doctrine element, the implied trust theory would have to be abandoned in its entirety. *Presbyterian Church v. Eastern Heights Church*, 225 Ga. 259, 167 S.E.2d 658 (1969), *cert. denied*, 396 U.S. 1041, 90 S.Ct. 680, 24 L.Ed.2d 685 (1970).

The neutral principles rule was examined in *Maryland & Virginia Eldership v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970), and was then somewhat circumscribed by the decision in *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). However, neither of these cases gave concrete guidance as to the strict application of the rule, and this resulted in a number of divergent lower court decisions. *See, e.g., First Presbyterian Church v. United Presbyterian Church*, 430 F.Supp. 450 (N.D.N.Y.1977); *Presbytery of the Covenant v. First Presbyterian Church*, 552 S.W.2d 865 (Tex.Civ.App.1977); *Kelley v. Riverside Boulevard Independent Church of God*, 44 Ill.App.3d 673, 3 Ill.Dec. 298, 358 N.E.2d 696 (1976); *Board of Church Extension v. Eads*, 230 S.E.2d 911 (W.Va.1976).

This ambiguity was dissipated in *Jones v. Wolf, supra*. By applying the *Jones* definition of neutral principles and comparing its facts to the facts of this case, we conclude that the trial court should not have deferred to the diocesan decision. Rather, the dispute should have been settled according to the *Jones* neutral principles approach.

*Jones* involved a dispute over control of the local church between two factions of a Presbyterian congregation. Just as in the case at bar, a majority of the local congregation had voted to withdraw from the general church and had retained control of the local church property. Representatives

of the minority faction brought suit seeking declaratory and injunctive relief establishing their right to exclusive control of the local church's property as the faction loyal to the general church.

Applying the neutral principles rule, the trial court ruled the majority was entitled to possession, and the Georgia Supreme Court affirmed. *Jones v. Wolf,* 241 Ga. 208, 243 S.E.2d 860 (1978). The United States Supreme Court agreed with Georgia's application of the neutral principles rule, but remanded for a more definite statement of the grounds for its decision. *Jones v. Wolf, supra.* On remand, the Georgia Supreme Court ruled that the presumption in favor of majority control is overcome only by statements contained in church documents pertaining directly to church property.[1] *Jones v. Wolf,* 244 Ga. 388, 260 S.E.2d 84 (1979), *cert. denied,* 444 U.S. 1080, 100 S.Ct. 1031, 62 L.Ed.2d 763 (1980).

In its *Jones* decision, the United States Supreme Court stated: "There can be little doubt about the general authority of civil courts to resolve [the] question [of church property ownership]." And, it ruled that when a court attempts to resolve that question, it may apply the neutral principles rule to inquire into "the language of the deeds, the terms of the local church charters, the state statutes governing the holding of church property, and the provisions in the constitution of the general church concerning the ownership and control of church property." But, it cautioned that, "in undertaking such an examination, a civil court must take special care to scrutinize the documents in purely secular terms." If a religious organization wishes to avoid searching examination into its documents, it may, "[t]hrough appropriate reversionary clauses . . . specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy."

The Supreme Court explained that the primary advantage of the neutral principles approach is that "it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity." It "shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties."

■ The Supreme Court in *Jones* encouraged the states to adopt a "presumptive rule of majority representation," defeasible upon a showing that the identity of the local church is to be determined by some other means. We adopt the majority rule for control of church property in this state.

■ In *Bernson v. Koch,* 35 Colo.App. 257, 534 P.2d 334 (1975) this court applied a neutral principles approach set out in pre-*Jones* church property dispute cases, specifically, the "formal title" approach suggested by *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg,* 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970) (Brennan, J., concurring). Under the formal title approach, a court can "determine ownership by studying deeds, reverter clauses and general state corporation laws." Because the constitution of the local church construed in *Bernson* gave control of the corporate property to the members of the Church Council, which followed directives of the congregation, the *Bernson* court found that the majority of the voting members of the church was entitled to the use, possession, and enjoyment of the church properties.

To the same effect, the Vestry, the Episcopal equivalent of the *Bernson* Church Council, controlled the St. Mary's parish at

---

1. It stated: "Georgia has adopted for use in church local schism cases a 'presumptive rule of majority representation, defeasible upon a showing that the identity of the local church is to be determined by some other means.' *Jones v. Wolf, supra,* at [607], 99 S.Ct. at 3027. That presumption is overcome under Georgia law by an application of what has come to be known as 'neutral principles' of law—that is, 'state statutes, corporate charters, relevant deeds, and the organizational constitutions of the denomination' . . . [C]hurch documents will be considered only insofar as they determine or assist in the determination of the persons who are 'entitled to possess and enjoy the property . . . .' "

the direction of the majority of members of the parish. Here, the local church does not have a constitution which expressly vests control of the local property in the majority. However, the formal title approach also requires that a court examine general state corporation laws. The laws under which this parish was incorporated provide for majority control of property. Thus, consistent with *Bernson,* we apply the neutral principles approach to grant title to the majority.

▆▆ We will here examine the relevant church documents to determine whether that presumption has been overcome in this case.[2] The trial court found that it could not inquire into church property ownership, because it found that the Episcopal Church was hierarchical as to temporal as well as doctrinal matters. However, this inquiry stopped short of that required by the Supreme Court in *Jones, supra.* Under *Jones,* a court, when viewing a church property dispute, should not stop with the *general* conclusion that a church is hierarchical as to temporal matters. Rather, a court should *specifically* inquire as to whether the documents indicate that the parties intended to create a trust in favor of the general church. Because the trial court did not determine that the documents expressly created such a trust, its unquestioning deference to the diocesan decision which recognized the minority bordered on violating the establishment of religion clause of the First Amendment.

▆▆ Upon conducting the search required by *Jones,* we find nothing in the deed, the articles of incorporation, the by-laws, or the canons or constitutions of the national church or the Colorado Diocese which creates an express trust in favor of the general church.

First, the deed is in the name of St. Mary's Church, with no reference to a trust in favor of the Diocese or national church.

And, although it is true that St. Mary's formally acceded through its articles of incorporation and by-laws to the canons and constitution of the national church and the Colorado Diocese, there is nothing in either the articles or by-laws which creates a trust in the church property in favor of the national church or Diocese. There is also no language in the canons or constitution of the Diocese or national church which reserves such a trust. Thus, there is nothing here which indicates that the majority presumption should not apply.

Additionally, the local parish properly observed corporate procedures in voting to secede. The majority of the board of directors of a non-profit corporation manage the affairs of that corporation. Section 7–24–101, C.R.S.1973. If the board of directors wishes to amend its articles of incorporation, it adopts a resolution setting forth the proposed amendment and directing that it be submitted to a vote of the members, and a two-thirds vote of the members constitutes approval. Section 7–2–107, C.R.S. 1973. There is no evidence in the record to indicate that these procedures were not followed in this case. Accordingly, the majority's vote should be enforced by Colorado courts under general principles of law relating to non-profit corporations in this state.

Just as the Supreme Court did in *Jones,* we feel it advisable to counsel religious organizations that such intra-church disputes may be kept from the courts, if proper procedures are followed:

"Under the neutral-principles approach, the outcome of the church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property. They can modify the deeds or the corporate charter to include a right of reversion or trust in favor of the general church. Alternative-

---

2. Normally, this court would remand for application of the legal principles announced herein to the facts. However, because all the relevant evidence in this case is documentary, and has been included in the record on appeal, in the interest of time, we have conducted our own examination of those documents. *See Grossman v. Sherman,* 198 Colo. 359, 599 P.2d 909 (1979).

ly, the constitution of the general church can be made to recite an express trust in favor of the denominational church. The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form." *Jones v. Wolf* 443 U.S. at 606, 99 S.Ct. at 3027, 61 L.Ed.2d at 786.[3]

The judgment is reversed and the cause is remanded for entry of judgment granting all real and personal property owned by the original St. Mary's Episcopal parish to the majority of the members of the original St. Mary's Episcopal parish, appellants herein.

KIRSHBAUM and TURSI, JJ., concur.

**3.** Subsequent to the action discussed herein taken by the parish of St. Mary's, the above was accomplished by the Protestant Episcopal Church of the United States of America. In 1979, at its General Convention, the church adopted the following amendment to its canons: "[a]ll real and personal property held by or for the benefit of any Parish, Mission, or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission, or Congregation is located."