The BISHOP AND DIOCESE OF COLO-RADO, a Colorado nonprofit corpora-tion, the Reverend Charles Larry Day, Allen Uyeda, Robert Douglass, H. David Huskin, Harry Thom, John Brown, Jo-seph Esch, Carla Parnell, Mildred Mul-lenax, John Helmore, Otis Drury, Ma-rian Lattimore, as members of the Ves-try of the Episcopal Parish of St. Mary's, the Episcopal Parish of St. Mary's, and Episcopal Church of St. Mary, a Colorado nonprofit corpora-tion, Petitioners,

v.

The Reverend James O. MOTE, John Ar-chibold, Marvin Olsen, John Brainerd, Wayne Gill, Chris Woodbury, Richard Atchison, Charles Buell, Rick Hill, Wal-ter Kulp, James Lucero, Lorne Scofield, and Saint Mary's Church, a Colorado nonprofit corporation, Respondents.

No. 83SC104.

Supreme Court of Colorado,
En Banc.

Jan. 13, 1986.
Rehearings Denied Feb. 24, 1986.

Miles M. Gersh, Denver, for petitioners.

Skelton, Oviatt & O'Dell, Forrest C. O'Dell, Wheat Ridge, for all respondents except John Archibold.

John Archibold, pro se.

LOHR, Justice.

We granted certiorari to review the judgment of the Colorado Court of Appeals in *Bishop & Diocese of Colorado v. Mote*, 668 P.2d 948 (Colo.App.1983) *(Mote)*, involving a dispute over the control of the real and personal property of St. Mary's Church in Denver. The case arose as a result of the decision of a majority of the members of St. Mary's to secede from the national church, the Protestant Episcopal Church in the United States of America (PECUSA), because of differences over doctrine. The group remaining loyal to the general church[1] brought suit to determine the rights to the property of St. Mary's. The Denver District Court sustained the claims of the plaintiffs and decreed that rightful control of the church property was vested in the minority group who remained loyal to the general church. The court of appeals reversed, concluding that the church property should be awarded to the secessionist majority group of St. Mary's members. We elected to review the court of appeals' decision to determine whether that court erred in adopting certain legal standards to be applied in resolving church property disputes; whether the standards as adopted by the court of appeals, if proper, could be applied to the facts of this case to the detriment of the plaintiffs without resulting in an unconstitutional retroactive application of law; and whether the court of appeals erred in holding that the facts as found by the district court did not establish that an express trust had been imposed upon the local church property in favor of the general church. We reverse.

### I.

The essential facts as found by the district court are based in part on a stipulation by the parties, are supported by evidence in the record, and are not disputed here.

St. Mary's Church was first established as a mission within PECUSA in the 1930s

---

**1.** We sometimes use the term "national church" to refer to PECUSA and use the term "general church" to include the entire relevant church organization, including most pertinently the Colorado diocese as well as PECUSA.

and was incorporated under the laws of the state of Colorado in 1934. *See* §§ 2384–2399, Compiled Laws of Colorado (1921 and 1932 Supp.), now codified as amended as article 50 of title 7, 3 C.R.S. (1973 & 1985 Supp.) (relating to the incorporation of religious, educational and benevolent societies).[2] Legal title to the real and personal property at issue in this dispute was acquired and is held by the corporate entity, St. Mary's Church.

The original incorporators specified in their Affidavit of Incorporation that they had "unanimously decided to organize as a Protestant Episcopal Church under the diocese of Colorado with the corporate name of SAINT MARYS CHURCH." The diocese is one of the subordinate geographical units of the national church, PECUSA, and is presently incorporated as a Colorado nonprofit corporation under the name of The Bishop and Diocese of Colorado. The diocese is presided over by a bishop, who is both its chief ecclesiastical authority and the chief executive officer of its corporate entity. The diocese has a legislative and policy-making body called the Annual Convention and an executive body, the Diocesan Executive Council, which has the responsibility to carry out the policies and programs of the Annual Convention and has broad responsibility over financial and property matters in the diocese.

In 1954, the membership of St. Mary's sought to upgrade their status to that of a PECUSA parish within the diocese of Colorado. In seeking to be recognized as a parish, the membership of St. Mary's unanimously adopted a resolution acceding to the constitutions of the national church and of the diocese, recognizing the authority of the General Convention of PECUSA, the policy-making body of the national church, and promising obedience to the canons of the national church and of the diocese. The diocese approved the request.

In 1955, the year after it became a parish, St. Mary's requested and received the consent of the diocese to revise its articles of incorporation. The diocesan canons required, and still require, the consent of the bishop and the chancellor or vice-chancellor of the diocese before any parish may file or amend articles of incorporation.

The revised articles provided, among other things, that "[t]he objects and purposes for which said Parish is incorporated are to administer the temporalities of the Protestant Episcopal Church in the Parish"; that "the corporation may not incur indebtedness which may alienate or encumber church property without the consent in writing of the Diocese of Colorado, a corporation, expressed by resolution of its Board of Trustee[s]"; and that the corporation "does hereby expressly accede to all the provisions of the constitution and canons adopted by the General Convention of the Protestant Episcopal Church in the United States of America, and to all of the provisions of the constitution and canons of the Diocese of Colorado." The articles of incorporation as amended in 1955 were not altered until 1976, when a majority of the membership of St. Mary's voted to disaffiliate from PECUSA.

Along with the amended articles of incorporation in 1955, St. Mary's adopted corporate bylaws. These bylaws provided that the governing authority of the corporation would consist of the parish rector as president, a senior warden, a junior warden, and nine vestrymen, all acting together as a Board of Trustees. Article II of the bylaws, captioned "Accession," provided that

**2.** Prior to 1968, the incorporation of any religious society, including a church, was governed by the predecessor to article 50 of title 7, 3 C.R.S. (1973 & 1985 Supp.). The provisions of article 50, however, do not apply to any religious society formed after December 31, 1967, or to any religious corporation formed prior to January 1, 1968, "which has elected to accept the provisions of articles 20 to 29 of this title [the Colorado Nonprofit Corporation Act]."

§ 7–50–101(2), 3 C.R.S. (1973). Although not mentioned in the district court's findings, one witness testified that St. Mary's opted to be governed by the provisions of the Colorado Nonprofit Corporation Act, as permitted by section 7–50–101(2), on April 30, 1976. This was approximately six months before the schism within the local church. No party disputes this testimony.

St. Mary's acceded to the constitution and canons of the diocese and the national church, and that "[t]he parish shall have control of its own local affairs but nothing shall be done which conflicts with the Canons of the Church, either General or Diocesan." There was no change in the accession provision from 1955 until the disaffiliation in 1976.

Beginning in the early 1970s, several doctrinal controversies occurred within PECUSA concerning changes in the Book of Common Prayer, the authority of bishops to terminate marriages, the propriety of the ordination of women to the priesthood and other matters. In September of 1976, the General Convention of PECUSA approved the ordination of women to the priesthood. Two months later, at the Annual Convention of the Diocese of Colorado, the delegation from St. Mary's presented a resolution calling upon the diocese to withdraw from PECUSA in protest to the ordination of women and other actions taken by PECUSA. When the convention rejected the resolution, most of the members of the St. Mary's delegation walked out. On November 28, 1976, at a meeting of the membership of St. Mary's, the members voted 197 to 79 to withdraw from PECUSA and to amend the articles of incorporation by deleting all provisions recognizing the authority of PECUSA and the diocese. The secessionist majority voted a year later to affiliate St. Mary's Church with the newly formed Anglican Catholic Church.

Soon after the disaffiliation vote, the bishop met with the minority of St. Mary's members still loyal to PECUSA and formally recognized this minority as representing the PECUSA parish of St. Mary's. These individuals have since been meeting in quarters rented from another Denver church. The loyal minority elected new vestry members to govern the parish to replace those who had withdrawn from PECUSA. On December 14, 1976, the Diocesan Executive Council adopted a resolution declaring that the diocese "does not approve or recognize the action taken by St. Mary's Church to withdraw from the Diocese of Colorado, supports those members of St. Mary's Church who voted against such withdrawal, and affirms its ecclesiastical ties and its rights with respect to the non-profit corporation known as St. Mary's Church."

The secessionist majority refused requests and demands to surrender possession of the property of St. Mary's Church either to the diocese or to the governing body representing those members of St. Mary's who remained loyal to PECUSA. For this reason, the plaintiffs, the group loyal to PECUSA,[3] filed suit in Denver District Court seeking declaratory and injunctive relief, including the recovery of possession of all real and personal property of St. Mary's held by the secessionists. After a trial to the court, the district court, on January 21, 1980, found the facts as outlined above and decreed that the purported amendments of November 28, 1976, to the articles of incorporation of St. Mary's Church were ineffective and that the prior articles remained in effect; that all real and personal property to which the corporate entity, St. Mary's Church, held legal or equitable title as of November 28, 1976, "is rightfully under the dominion and control of the individual plaintiffs in this case, in their capacity as rector and members of the vestry of that church"; and that the individual defendants and other

**3.** The plaintiffs include the members of the vestry, or governing board, representing those members of St. Mary's who voted in November of 1976 to remain affiliated with PECUSA; the parish priest, or rector, of the PECUSA parish of the Episcopal Church of St. Mary's appointed by the bishop after the schism; the nonprofit corporation formed in 1977 by those members of St. Mary's Church who had voted to remain affiliated with PECUSA; and the diocesan corporation, The Bishop and Diocese of Colorado.

The defendants are those members of St. Mary's who are also members of the governing board representing those who withdrew from PECUSA; the former rector of St. Mary's Church, who is now the pastor of the group that disaffiliated from PECUSA and also a bishop in the Anglican Catholic Church; and St. Mary's Church, the Colorado nonprofit corporation controlled by the secessionist majority of the members of St. Mary's.

former members of St. Mary's who withdrew from PECUSA had no interest of any kind in the real and personal property to which St. Mary's Church held legal or equitable title as of November 28, 1976. The court directed the individual defendants to surrender possession and control of that property and to provide an inventory and accounting to the plaintiffs of any real and personal property of St. Mary's Church that the defendants transferred, sold, expended or conveyed after November 28, 1976. The court stated that after the accounting, the court would enter such further orders respecting damages as might be appropriate. The parties later entered into a stipulation as to the amount of damages, and the court approved that stipulation.

The trial court rendered its judgment after applying what is termed a "polity" analysis to the facts of this case. As part of this approach, the court concluded that PECUSA was a hierarchical church; that the authoritative decisionmaking bodies within that hierarchical church had determined that the loyal minority was the true "group which comprises St. Mary's Church" and was entitled to possession and control of the property held by St. Mary's Church; and that this determination by the appropriate governing body of the hierarchical church organization must be deferred to and enforced by the civil courts.

The court of appeals reversed. The court of appeals held that the trial court erred by applying the "polity" approach in resolving this dispute rather than employing what is called the "neutral principles" analysis. *Mote*, 668 P.2d at 950–52. As part of the neutral principles analysis, the court of appeals adopted a "presumptive rule of majority representation" for local churches involved in disputes over control of church property, a presumption "defeasible" upon a showing that the identity of the church and control of the local church property "is to be determined by some other means." *Id.* at 952. After adopting this

rule, the court of appeals examined the record only to determine whether an express trust over the property held by St. Mary's Church had been created in favor of the general church. *Id.* at 953. Finding no such express trust, the court of appeals concluded that control over the local church property was in the secessionist majority of the membership of St. Mary's. *Id.* That court reversed the judgment of the district court and remanded the case for entry of a judgment "granting all real and personal property owned by the original St. Mary's Episcopal parish to the majority of the members of the original St. Mary's Episcopal parish." *Id.* at 954.

The plaintiffs then filed a petition for certiorari, which we granted.

## II. A.

There is no dispute as to who holds legal title to the church property—title is held by the corporate entity known as "St. Mary's Church." Nor is there any dispute as to which group is the "true" subordinate PECUSA church—the loyal minority has been recognized by the diocese as representing the PECUSA parish of St. Mary's. The only question presented in this case, as in *Jones v. Wolf,* 443 U.S. 595, 602, 99 S.Ct. 3020, 3024, 61 L.Ed.2d 775 (1979), is which of the two contending groups of the local church is entitled to possess and enjoy the church property.

The civil courts have the general authority to resolve this question. *Jones v. Wolf,* 443 U.S. at 602, 99 S.Ct. at 3024. The state has an obvious and legitimate interest in the peaceful resolution of property disputes and in providing a civil forum in which the ownership and control of church property can be determined conclusively. *Id.; Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U.S. 440, 445, 89 S.Ct. 601, 604, 21 L.Ed.2d 658 (1969) (*Blue Hull*). However, the First Amendment to the United States Constitution[4] severely

---

**4.** The First Amendment to the United States Constitution provides, in relevant part:

Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof . . . .

circumscribes the role that civil courts may play in resolving church property disputes. *Jones v. Wolf*, 443 U.S. at 602, 99 S.Ct. at 3024; *Blue Hull*, 393 U.S. at 449, 89 S.Ct. at 606. Most importantly, the first amendment prohibits civil courts from resolving church property disputes by inquiring into and resolving disputed issues of religious doctrine and practice. *Id.; Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich*, 426 U.S. 696, 710, 96 S.Ct. 2372, 2381, 49 L.Ed.2d 151 (1976) (*Serbian Orthodox Diocese*); *Maryland & Virginia Eldership of the Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368, 90 S.Ct. 499, 500, 24 L.Ed.2d 582 (1970) (per curiam) (*Sharpsburg*). When a disputed issue of religious doctrine or practice is relevant to a property dispute, a civil court must defer to the resolution of that issue arrived at by the highest court, tribunal or controlling body of a hierarchical church organization. *Jones v. Wolf*, 443 U.S. at 602, 604, 99 S.Ct. at 3024, 3026; *Serbian Orthodox Diocese*, 426 U.S. at 709, 724–25, 96 S.Ct. at 2387–88; *Watson v. Jones*, 80 U.S. (13 Wall.) 679, 727, 20 L.Ed. 666 (1871).

Subject to the foregoing limitations, however, the first amendment does not dictate that a state must follow a particular method of resolving a church property dispute. *Jones v. Wolf*, 443 U.S. at 602, 99 S.Ct. at 3025. "[A] state may adopt *any* one of various approaches for settling church property disputes so long as it involves no consideration of doctrinal matters, whether the ritual and liturgy of worship or the tenets of faith." *Id.*, quoting *Sharpsburg*, 393 U.S. at 368 (Brennan, J., concurring) (emphasis in original).[5]

Although the Court stated in *Jones v. Wolf* that various constitutionally permissible approaches exist for analysis of a church property dispute, only two have been distinctly identified—the "polity" approach and the "neutral principles" approach.[6]

---

**5.** Article II, Section 4, of the Colorado Constitution provides:

> The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever hereafter be guaranteed; and no person shall be denied any civil or political right, privilege or capacity, on account of his opinions concerning religion; but the liberty of conscience hereby secured shall not be construed to dispense with oaths or affirmations, excuse acts of licentiousness or justify practices inconsistent with the good order, peace or safety of the state. No person shall be required to attend or support any ministry or place of worship, religious sect or denomination against his consent. Nor shall any preference be given by law to any religious denomination or mode of worship.

There is no reason to believe that the limiting effect of article II, section 4, on the judicial resolution of church property disputes will differ from that of the first amendment as described in the text. *See Conrad v. City and County of Denver*, 656 P.2d 662, 667 (Colo.1982) (article II, section 4, embodies the same values of free exercise and governmental non-involvement secured by the religious clauses of the first amendment, although determination of a first amendment challenge will not necessarily be dispositive of the state constitutional issue). *See also Americans United for Separation of Church and State Fund, Inc. v. State of Colorado*, 648 P.2d 1072, 1078, 1081–82 (Colo.1982);

*Zavilla v. Masse*, 112 Colo. 183, 187, 147 P.2d 823, 824–25 (1944). The court of appeals, in four church property dispute appeals, has never suggested an analytical distinction based on the Colorado Constitution. *Dickey v. Snodgrass*, 673 P.2d 51 (Colo.App.1983); *Bishop & Diocese of Colorado v. Mote*, 668 P.2d 948 (Colo.App. 1983); *Bishop & Diocese of Colorado v. St. Paul's Episcopal Church of Central City*, 80CA0317 (Dec. 26, 1980) (not selected for official publication); *Bernson v. Koch*, 35 Colo.App. 257, 534 P.2d 334 (1975).

**6.** In a concurring opinion to the per curiam opinion in *Sharpsburg*, Justice Brennan identified a third approach—the passage of special statutes governing church property arrangements in a manner that precludes state interference in doctrine. 396 U.S. at 370, 90 S.Ct. at 501. Since the neutral principles approach involves, among other things, an analysis of relevant state statutes, *Jones v. Wolf*, 443 U.S. at 603, 99 S.Ct. at 3025; *Sharpsburg*, 396 U.S. at 367, 90 S.Ct. at 499 (per curiam) and at 370 (Brennan, J., concurring), it is not clear how this third alternative differs from a neutral principles analysis. Perhaps Justice Brennan made the distinction because he equated the neutral principles approach with what he called the "formal title" doctrine. 396 U.S. at 370, 90 S.Ct. at 501. *See also Serbian Orthodox Diocese*, 426 U.S. at 723 n. 15, 96 S.Ct. at 2387 n. 15 (explaining that the court was not applying the "formal title" doctrine in that case). Also unclear is the dis-

### 1.

The polity approach focuses primarily on the organizational structure of the church in question, i.e., whether the local church is congregational (independent) or whether it is a subordinate unit of a hierarchical organization. The polity approach was first utilized by the United States Supreme Court in *Watson v. Jones*, a case involving a church schism and property dispute that arose out of the civil war—a group of members of a local Presbyterian church in Kentucky withdrew from the national Presbyterian church rather than obey the national church's order to support the union and disavow slavery.

In *Watson*, the Court noted that when a local church is congregational in nature, that is, governed independently of any other ecclesiastical body, "the rights of [conflicting groups] to the use of the property must be determined by the ordinary principles which govern voluntary associations." 80 U.S. at 725. The courts should enforce the corporate and property decisions arrived at by a majority of the members of the local church or "by such other local organism as [the congregational organization] may have instituted for the purpose of ecclesiastical government." *Id.* at 724. *See Sharpsburg*, 396 U.S. at 368–69, 90 S.Ct. at 500 (Brennan, J., concurring).

However, when "the religious congregation or ecclesiastical body holding the property is but a subordinate member of some general church organization in which there are superior ecclesiastical tribunals with a general and ultimate power of control more or less complete, in some supreme judicatory over the whole membership of that general organization," *Watson*, 80 U.S. at 722–23, a different method for resolving the dispute must be utilized. In such an instance, a court must defer to and enforce the decision of the highest church tribunal that has ruled as to a question of "discipline, or of faith, or ecclesiastical rule, custom, or law." *Id.* at 727. As is shown by the holding in *Watson*—in which the court deferred to and enforced the resolution of the property dispute by the national Presbyterian church—issues of control over and rights to property are subsumed within that list. *See also Sharpsburg*, 396 U.S. at 369, 90 S.Ct. at 500 (Brennan, J., concurring).

The absolute deference afforded to the determinations of hierarchical church tribunals in *Watson* was tempered by the holding in *Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16, 50 S.Ct. 5, 7, 74 L.Ed. 131 (1929), that such decisions will be enforced "[i]n the absence of fraud, collusion, or arbitrariness." The Court later narrowed this exception in *Serbian Orthodox Diocese*, holding that

> whether or not there is room for "marginal civil court review" under the nar-

---

tinction between neutral principles analysis and a "third method" identified by the court of appeals in *Bernson v. Koch*—the application of trust theories, which is there contrasted with the "formal title" approach of *Sharpsburg*, 35 Colo. App. at 262, 534 P.2d at 337. *And see Dickey v. Snodgrass*, 673 P.2d at 52 ("In resolving church property disputes, this court applies the neutral principles approach, specifically the 'formal title' approach."). Again, an examination of the evidence to see whether a trust has been imposed on the local church property in favor of the general church is a recognized part of a neutral principles analysis. *Jones v. Wolf*, 443 U.S. at 603–04, 99 S.Ct. at 3025. There is an indication that the trial judge in the present case was misled by the equation of the "formal title" doctrine—and the implications arising from its name—with the neutral principles approach. In his findings, the judge stated that the polity approach was the most appropriate means of

resolving the dispute. *See Watson v. Jones*, 80 U.S. (13 Wall.) 679, 20 L.Ed. 666 (1871). He then stated: "Merely to identify the formal title holder would not be a reasonable or apt approach to this dispute because, of course, the critical issue has never been whether 'St. Mary's Church' as opposed to some other entity has title to the property." This was the only statement in the findings concerning the obvious rejection of the neutral principles approach urged by the defendants.

There is no explanation anywhere as to how the "formal title" doctrine differs from the neutral principles analysis, or how it might narrow or otherwise alter the analytical review of various documents, statutes and other relevant evidence as compared to a "broader" neutral principles analysis. The "formal title" term seems to yield no assistance in explaining or defining the scope of review under the neutral principles analysis, and we decline to use it.

row rubrics of "fraud" or "collusion" when church tribunals act in bad faith for secular purposes, no "arbitrariness" exception—in the sense of an inquiry whether the decisions of the highest ecclesiastical tribunal of a hierarchical church complied with church laws and regulations—is consistent with the constitutional mandate that civil courts are bound to accept the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law. For civil courts to analyze whether the ecclesiastical actions of a church judicatory are in that sense "arbitrary" must inherently entail inquiry into the procedures that canon or ecclesiastical law supposedly requires the church judicatory to follow, or else into the substantive criteria by which they are supposedly to decide the ecclesiastical question. But this is exactly the inquiry that the First Amendment prohibits....

426 U.S. at 713, 96 S.Ct. at 2382 (footnote omitted).

*Watson v. Jones* was decided at a time when the first amendment had not yet been applied to the states through the fourteenth amendment and was a pre-*Erie* [7] diversity case in which the Court purportedly applied federal common law. However, the Court later recognized that certain of the principles central to *Watson* are rooted in the protections of the first amendment. *See Jones v. Wolf,* 443 U.S. at 617 n. 4, 99 S.Ct. at 3027 n. 4 (Powell, J., dissenting); *Serbian Orthodox Diocese,* 426 U.S. at 710–11, 96 S.Ct. at 2381; *Blue Hull,* 393 U.S. at 446–48, 89 S.Ct. at 604–06; *Kedroff v. Saint Nicholas Cathedral of the Russian Orthodox Church in North America,* 344 U.S. 94, 115–16, 73 S.Ct. 143, 154–55, 97 L.Ed. 120 (1952). That the use of the polity analysis as articulated in *Watson* is not constitutionally mandated, however, is made certain by the holding of *Jones v. Wolf,* in which the use of the alternative neutral principles approach also

was approved as consistent with the first amendment. 443 U.S. at 604, 99 S.Ct. at 3026.

2.

■ The neutral principles analysis first appeared in 1969 in *Blue Hull,* in which the United States Supreme Court reviewed on certiorari a church property dispute decision by the Supreme Court of Georgia. Under Georgia law, "the right to the property previously used by the local churches was made to turn on a civil court jury decision as to whether the general church abandoned or departed from the tenets of faith and practice it held at the time the local churches affiliated with it." 393 U.S. at 441, 89 S.Ct. at 602 (the "departure from doctrine" test). The United States Supreme Court held that the departure from doctrine test violates the first amendment because it forces a civil court to resolve issues of religious doctrine. Justice Brennan, writing for the majority, stated:

It is obvious, however, that not every civil court decision as to property claimed by a religious organization jeopardizes values protected by the First Amendment. Civil courts do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law, developed for use in all property disputes, which can be applied without "establishing" churches to which property is awarded.

393 U.S. at 449, 89 S.Ct. at 606. The Court advised religious organizations to "structure relationships involving church property so as not to require the civil courts to resolve ecclesiastical questions." *Id.*

Next, in *Sharpsburg,* the Court dismissed an appeal from the Maryland Court of Appeals, stating in a per curiam opinion that the Maryland court's resolution of a church property dispute by relying upon "provisions of state statutory law governing the holding of property by religious corporations, upon language in the deeds conveying the properties in question to the

---

**7.** *Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct.     817, 82 L.Ed. 1188 (1938).

local church corporations, upon the terms of the charters of the corporations, and upon provisions in the constitution of the General Eldership pertinent to the ownership and control of church property," 396 U.S. at 367–68, 90 S.Ct. at 499–500 (footnote omitted), did not involve an inquiry into religious doctrine, *id.* at 368, 90 S.Ct. at 500. For that reason, the Court concluded, the appeal did not present a substantial federal question. *Id.* In a concurring opinion, Justice Brennan articulated the differences between the deference approach of *Watson* and the neutral principles approach recognized in *Blue Hull* and *Sharpsburg* and concluded that a state could adopt either approach, or any other, as long as the analysis involves no consideration of doctrinal matters, 396 U.S. at 368–70, 90 S.Ct. at 500–01, a conclusion subsequently embraced by a majority of the Court in *Jones v. Wolf,* 443 U.S. at 602, 99 S.Ct. at 3024.[8]

Most recently, in *Jones v. Wolf,* the Court, reviewing a Presbyterian church schism and property dispute quite similar to the dispute now before us, explicitly held that "a State is constitutionally entitled to adopt neutral principles of law as a means of adjudicating a church property dispute." 443 U.S. at 604, 99 S.Ct. at 3026. In resolving the church property dispute, the Georgia court had examined state statutes, the corporate charter of the local church, and the constitution of the general church and had found no trust imposed on the property for the benefit of the general church that would remove control over the property from the local church, the legal title holder. 443 U.S. at 601, 99 S.Ct. at 3024. The Court noted, however, that the determination that the local church, and not the general church, controlled the church property did not end the dispute. A remand was necessary to determine whether the schismatic majority or the loyal minority controlled the local church corporation and, thus, the property owned by the corporation. *Id.* at 606–10, 99 S.Ct. at 3026–29. The Court stated that the adoption of "a presumptive rule of majority representation, defeasible upon a showing that the identity of the local church is to be determined by some other means, ... would be consistent with both the neutral-principles analysis and the First Amendment." *Id.* at 607, 99 S.Ct. at 3027. However, the Court did not require Georgia to adopt a presumptive role of majority representation and stated that, if adopted, "the State may adopt any method of overcoming the majoritarian presumption, so long as the use of that method does not impair free-exercise rights or entangle the civil courts in matters of religious controversy." *Id.* at 608, 99 S.Ct. at 3028 (footnote omitted).

It can be said with little reservation that the majority opinion in *Jones v. Wolf* ex-

---

8. The neutral principles analysis played no role in the resolution of the first post-*Sharpsburg* church dispute before the Court, *Serbian Orthodox Diocese. See* 426 U.S. at 723 n. 15, 96 S.Ct. at 2387 n. 15 ("neutral principles" being called there the "formal title" doctrine). *Serbian Orthodox Diocese* involved a challenge to the hierarchical church's defrockment of a bishop and division of a diocese, and only incidentally involved an issue as to control of property. *Id.* at 709, 723, 723 n. 15, 96 S.Ct. at 2380, 2387, 2387 n. 15. The Court held that the Illinois Supreme Court's inquiry into the validity of these ecclesiastical decisions by the mother church, and the reversal of such decisions, violated the First and Fourteenth Amendments to the United States Constitution.

    For where resolution of [religious] disputes cannot be made without extensive inquiry by civil courts into religious law and polity, the First and Fourteenth Amendments mandate that civil courts shall not disturb the decisions of the highest ecclesiastical tribunal within a church of hierarchical polity, but must accept such decisions as binding on them, in their application to the religious issues of doctrine or polity before them.

426 U.S. at 709, 96 S.Ct. at 2380. *See also Douglass v. First Baptist Church of Fort Collins,* 132 Colo. 286, 287 P.2d 965 (1955), in which we held that the First Baptist Church was a self-governing and independent religious congregation and that the decision of a majority of its members to disaffiliate from a national Baptist convention for doctrinal reasons was not open to attack in a civil suit by a dissenting minority of the congregation's members. *Douglass* arose prior to *Blue Hull* and *Sharpsburg,* but even if the neutral principles analysis had been articulated at that time, it could have played no role in the resolution of the particular structural dispute presented.

pressed a clear preference for the neutral principles approach over the polity approach, even while recognizing that a state could adopt a polity approach without violating the federal constitution:

> The primary advantages of the neutral-principles approach are that it is completely secular in operation, and yet flexible enough to accommodate all forms of religious organization and polity. The method relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice. Furthermore, the neutral-principles analysis shares the peculiar genius of private-law systems in general—flexibility in ordering private rights and obligations to reflect the intentions of the parties. Through appropriate reversionary clauses and trust provisions, religious societies can specify what is to happen to church property in the event of a particular contingency, or what religious body will determine the ownership in the event of a schism or doctrinal controversy. In this manner, a religious organization can ensure that a dispute over the ownership of church property will be resolved in accord with the desires of the members.
>
> . . . .
>
> The neutral-principles approach cannot be said to "inhibit" the free exercise of religion, any more than do other neutral provisions of state law governing the

manner in which churches own property, hire employees, or purchase goods. Under the neutral-principles approach, the outcome of a church property dispute is not foreordained. At any time before the dispute erupts, the parties can ensure, if they so desire, that the faction loyal to the hierarchical church will retain the church property.... The burden involved in taking such steps will be minimal. And the civil courts will be bound to give effect to the result indicated by the parties, provided it is embodied in some legally cognizable form.

443 U.S. at 603–04, 606, 99 S.Ct. at 3025–26, 3027 (footnote omitted).[9]

However, the majority did recognize that the application of the neutral principles approach is not "wholly free of difficulty" and noted:

> The neutral-principles method, at least as it has evolved in Georgia, requires a civil court to examine certain religious documents, such as a church constitution, for language of trust in favor of the general church. In undertaking such an examination, a civil court must take special care to scrutinize the document in purely secular terms, and not to rely on religious precepts in determining whether the document indicates that the parties have intended to create a trust. In addition, there may be cases where the deed, the corporate charter, or the constitution of the general church incorporates religious concepts in the provisions relating to the ownership of property. If in such a case the interpretation of the in-

---

**9.** Contrast those approving terms with the majority's opinion of the problems inherent in the polity approach:

> The dissent suggests that a rule of compulsory deference would somehow involve less entanglement of civil courts in matters of religious doctrine, practice, and administration. Under its approach, however, civil courts would always be required to examine the polity and administration of a church to determine which unit of government has ultimate control over church property. In some cases, this task would not prove to be difficult. But in others, the locus of control would be ambiguous, and "[a] careful examination of the constitutions of the general and local church, as

well as other relevant documents, [would] be necessary to ascertain the form of governance adopted by the members of the religious association." *Post*, at 619–620 [99 S.Ct. at 3033–3034]. In such cases, the suggested rule would appear to require "a searching and therefore impermissible inquiry into church polity." *Serbian Orthodox Diocese*, 426 U.S., at 723 [96 S.Ct., at 2387]. The neutral-principles approach, in contrast, obviates entirely the need for an analysis or examination of ecclesiastical polity or doctrine in settling church property disputes.

*Jones v. Wolf*, 443 U.S. at 605, 99 S.Ct. at 3026 (brackets in original).

struments of ownership would require the civil court to resolve a religious controversy, then the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body.

*Id.* at 604, 99 S.Ct. at 3026.

### B.

Having outlined the two possible approaches for resolving this church property dispute that have received explicit approval by the United States Supreme Court, we next must decide which analytical method we will adopt and apply in resolving this dispute. Unlike the appellate courts of many states,[10] this court has never addressed a church property dispute arising out of a church schism. Thus, we are not bound by direct precedent in deciding whether to apply a neutral principles or a polity analysis to the facts of this case.

We conclude that the neutral principles approach is preferable, and we adopt that analytical method as the law to be applied by Colorado courts when resolving disputes over the ownership and control of church property in this state.[11] We reach this conclusion principally because we are persuaded by the reasoning of the United States Supreme Court in *Jones v. Wolf* as to the advantages of the neutral principles approach, 443 U.S. at 603–04, 606, 99 S.Ct. at 3025–26, 3027 (quoted above).

Our decision to adopt the neutral principles approach is buttressed by the analysis adopted by the Colorado Court of Appeals in recent opinions concerning disputes over church property. That court has reviewed

10. Most courts faced with a post-*Jones* church property dispute did not have to choose between the polity approach and the neutral principles approach without precedential guidance. They simply noted that prior case law or statutes in their state required or suggested that one or the other approach be utilized. *E.g., Harris v. Apostolic Overcoming Holy Church of God, Inc.,* 457 So.2d 385, 387 (Ala.1984) (neutral principles); *Protestant Episcopal Church in the Diocese of Los Angeles v. Barker,* 115 Cal.App.3d 599, 171 Cal.Rptr. 541, 548–49, *cert. denied,* 454 U.S. 864, 102 S.Ct. 323, 70 L.Ed.2d 163 (1981) (neutral principles); *New York Annual Conference of the United Methodist Church v. Fisher,* 182 Conn. 272, 438 A.2d 62, 68 (1980) (polity approach); *Grutka v. Clifford,* 445 N.E.2d 1015, 1019 (Ind. App.1983), *cert. denied,* 465 U.S. 1006, 104 S.Ct. 998, 79 L.Ed.2d 231 (1984) (neutral principles); *Fluker Community Church v. Hitchens,* 419 So.2d 445, 447–48 (La.1982) (neutral principles); *Graffam v. Wray,* 437 A.2d 627, 634 (Me.1981) (neutral principles); *Babcock Memorial Presbyterian Church v. Presbytery of Baltimore,* 296 Md. 573, 464 A.2d 1008, 1016 (1983), *cert. denied,* 465 U.S. 1027, 104 S.Ct. 1287, 79 L.Ed.2d 689 (1984) (neutral principles); *Antioch Temple, Inc. v. Parekh,* 383 Mass. 854, 422 N.E.2d 1337, 1340–42 (1981) (polity); *Bennison v. Sharp,* 121 Mich.App. 705, 329 N.W.2d 466, 474 (1982) (polity); *Piletich v. Deretich,* 328 N.W.2d 696, 701–02 (Minn.1982) (neutral principles); *Protestant Episcopal Church v. Graves,* 83 N.J. 572, 417 A.2d 19, 23–24 (1980), *cert. denied sub nom. Moore v. Protestant Episcopal Church,* 449 U.S. 1131, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981) (polity); *Southside Tabernacle v. Pentecostal Church of God,* 32 Wash.App. 814, 650 P.2d 231, 235 (1982) (polity); *Church of God of Madison v. Noel,* 318 S.E.2d 920, 923–24 (W.Va.1984) (poli-

ty). A few courts chose a neutral principles approach after deciding not to follow more or less explicit polity precedents. *E.g., York v. First Presbyterian Church of Anna,* 130 Ill. App.3d 611, 85 Ill.Dec. 756, 474 N.E.2d 716 (1984), *cert. denied,* — U.S. —, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985); *Presbytery of Elijah Parish Lovejoy v. Jaeggi,* 682 S.W.2d 465 (Mo.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2361, 86 L.Ed.2d 262 (1985); *Presbytery of Beaver-Butler v. Middlesex Presbyterian Church,* 507 Pa. 255, 489 A.2d 1317, *cert. denied,* — U.S. —, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985); *Foss v. Dykstra,* 319 N.W.2d 499 (S.D.1982). And in *Fonken v. Community Church of Kamrar,* 339 N.W.2d 810 (Iowa 1983), the Iowa Supreme Court had no precedent requiring the selection of one approach over the other, but the court avoided the issue by applying both polity and neutral principles (reaching the same result) without expressing a preference for either one.

11. We recognize, however, as has the United States Supreme Court, that there may be cases in which interpretation of relevant documents would require a civil court to resolve a religious controversy. *Jones v. Wolf,* 443 U.S. at 604, 99 S.Ct. at 3026. In such instances, "the court must defer to the resolution of the doctrinal issue by the authoritative ecclesiastical body." *Id.* Moreover, we do not foreclose the application of a polity analysis in a case in which, for reasons presently unforeseen, constitutional constraints on evidence that a court could consider would either prevent a definitive resolution of a church property dispute or would so far preclude consideration of facts relevant to such a resolution as to prevent a just result under a neutral principles analysis.

four such disputes within the last decade, beginning with *Bernson v. Koch,* 35 Colo. App. 257, 534 P.2d 334 (1975). In all of them, the court of appeals applied a neutral principles analysis.

*Bernson,* a pre-*Jones* case, involved a dispute between two contending groups within the membership of Mt. Olive Evangelical Lutheran Church of Colorado Springs over one group's attempted withdrawal of the church from the Wisconsin Evangelical Lutheran Synod. 35 Colo.App. at 259–60, 534 P.2d at 335–36. The trial court held for the plaintiffs, the members loyal to the synod, in their suit to determine control over the church property. 35 Colo.App. at 261, 534 P.2d at 336. The court of appeals reversed.

The court of appeals first held that the trial court erred in the conclusion reached when applying the polity approach, as the trial court had found on sufficient evidence that Mt. Olive Church was an independent, self-governing religious congregation. 35 Colo.App. at 263, 534 P.2d at 337. As a result, "the proper church governing body was the . . . congregation, and not the Synod." *Id.* The court of appeals then went on to say:

> However, there is a more compelling reason for reversal of the trial court's judgment. As the concurring justices in *Sharpsburg* noted, courts may not use the polity approach if it involves consideration of doctrinal matters. Indeed, it has been stated that determination of a church's polity "will almost inevitably involve ecclesiastical considerations." *Merryman v. Price,* 147 Ind.App. 295, 259 N.E.2d 883, *cert. denied,* 404 U.S. 852 [92 S.Ct. 89, 30 L.Ed.2d 92]. . . . The present case furnishes an example of such entanglement of polity and doctrine. Plaintiffs' evidence included testimony to the effect that certain religious documents are susceptible of only one legitimate interpretation and that all members of the Church are, therefore, bound to adhere to the interpretation announced by the Synod. Thus, plaintiffs' evidence was that the Church's assertedly hierar-

chical structure is based, at least in part, upon a doctrinal belief. Therefore, since we are prohibited by First Amendment principles from using the polity approach, we employ the formal title method for resolution of church property disputes as suggested in the *Sharpsburg* case.

35 Colo.App. at 263, 534 P.2d at 337–38. Applying the neutral principles analysis, the court of appeals concluded that title was in the local church corporation, 35 Colo.App. at 263–64, 534 P.2d at 338; that no trust had been imposed on the property for the benefit of the general church, as the corporation charter referred only to the "Evangelical Lutheran Church" and not to the "Wisconsin Evangelical Lutheran Synod," 35 Colo.App. at 265–66, 534 P.2d at 338–39; and that the court of appeals would not enforce a provision in the church constitution relating to church schisms as to do so would require the resolution of an ecclesiastical dispute, i.e., which contending group had adhered to the church constitution, 35 Colo.App. at 264–65, 534 P.2d at 338.

*Bishop & Diocese of Colorado v. St. Paul's Episcopal Church of Central City,* 80CA0317 (Dec. 26, 1980), an unpublished opinion released prior to *Mote* but after *Jones v. Wolf,* involved facts almost identical to the instant case—a schism within a local PECUSA parish and a resulting church property dispute. The court of appeals applied a neutral principles analysis, finding this approach consistent with *Jones v. Wolf, Blue Hull* and *Bernson v. Koch.* Slip op. at 2. The court of appeals affirmed the district court's finding that the articles of incorporation of the local church imposed an express trust upon the property in favor of the general church. The court of appeals did not analyze the articles extensively, concluding simply that a provision that stated that the articles of incorporation were executed for the purpose of "erecting, holding, furnishing, and keeping in repair a church edifice and of maintaining religious services therein according to the forms and faith of the Protestant Episcopal Church of the United States" unam-

biguously created a trust in favor of the general church. Slip op. at 1, 3. Certiorari was denied in *St. Paul's Episcopal Church*. 81SC68 (June 22, 1981).

*St. Paul's Episcopal Church* was followed by *Mote*, the present case, in which the court of appeals adopted and applied the neutral principles analysis along with a presumptive rule of majority representation defeasible only, as applied in that case, if the documents indicate that the parties intended to create an express trust in favor of the general church. 668 P.2d at 952–53. Examining the deed, the articles of incorporation of St. Mary's Church, the corporate bylaws, the canons and constitutions of the national church and the local diocese, and the nonprofit corporation statutes, the court found no language creating a trust in favor of the general church. *Id.* The contrary finding in *St. Paul's Episcopal Church* was not mentioned.

The final case, *Dickey v. Snodgrass*, 673 P.2d 51 (Colo.App.1983), began when officers of the national organization of the African Methodist Episcopal Church attempted to convey the church property of the African Methodist Episcopal Church of Mesa County to certain property investors. The plaintiffs, who asserted that they were the trustees for the local church, sued to quiet title in themselves. *Id.* at 52. The court of appeals affirmed the trial court's judgment that the national church had no right, title or interest in the local church property. *Id.* The court began:

> In resolving church property disputes, this court applies the neutral principles approach, specifically the "formal title" approach suggested by [*Sharpsburg*, 396 U.S. at 370, 90 S.Ct. at 501] (Brennan, J., concurring). *See Bishop & Diocese v. Mote*, 668 P.2d 948 (Colo.App.1983) (*cert. granted on other grounds* August 23, 1983); *Bernson v. Koch*, 35 Colo.App. 257, 534 P.2d 334 (1975). On this basis, a court can "determine ownership by studying deeds, reverter clauses, and general state corporation laws." *Bernson, supra.*

*Id.* Applying that analytical method, the court determined that the record revealed that the property at issue had been conveyed to the African Methodist Episcopal Church of Mesa County; that the deed contained no trust language or reverter clause; that the incorporated local church had not conveyed its title to the property to the national church, although required to do so by the national church's Rules of Discipline; and that a provision in the local church's incorporation articles adopting the Rules of Discipline of the national church as the local church's mode of government did not give the national church any rights in the property. *Id.*

Although these decisions by the court of appeals do not bind us to adopt and apply the neutral principles approach, they lend support to our decision to do so. A holding consistent with the court of appeals' ten-year history of applying neutral principles of law to resolve church property disputes will promote the desirable goals of stability in the law and reinforcement of settled expectations.

We derive further support for our decision to apply neutral principles from a turn-of-the-century decision of this court. In *Horst v. Traudt*, 43 Colo. 445, 96 P. 259 (1908), we held that religious corporations "are subject to the principles of the common law and the practice and procedure applicable to corporations under the general incorporation laws, so far as the same are pertinent." 43 Colo. at 448, 96 P. at 259. *Horst* involved a suit by members of The First German Congregational Church at Globeville against Traudt to prevent Traudt from taking office as church pastor pursuant to a call from the ruling elders of the church, a call that the plaintiffs alleged to have been illegally obtained by the defendant at a meeting of the church congregation. 43 Colo. at 447, 96 P. at 259. We stated at the outset:

> The allegations of the complaint present no questions involving ecclesiastical matters or affairs; the sole question presented is the right of defendant to exercise and discharge the duties and receive the emoluments of pastor of the church, un-

der a contract with the church which plaintiffs allege was illegally obtained by the defendant.

*Id.* We then held as noted above and equated the trustees, wardens, vestrymen or other officers of a church corporation with the directors and officers of a corporation formed under the general incorporation laws and equated the church members with such a corporation's shareholders. 43 Colo. at 448, 96 P. at 259–60. We affirmed a dismissal of the suit, declining to alter the general rule that "[t]he courts will not, ... at the suit of a stockholder, or any number of stockholders, interfere with the internal affairs and management of a corporation," absent certain preconditions not present in that case. 43 Colo. at 448, 96 P. at 260.

As *Horst* did not involve a dispute between a local church and a general church, or a dispute over rights to church property, it is not controlling in this case. We derive general guidance from it, however, as a persuasive statement that this court should analyze legal issues that arise out of church organizations in the same manner as we would analyze those issues if they arose out of any other corporation or voluntary association.

## C.

■ Although we agree with the court of appeals that neutral principles of law should be applied in resolving the present dispute, we disagree with the manner in which that court applied the standard in this case.

### 1.

The court of appeals first adopted a presumptive rule of majority representation. *Mote*, 688 P.2d at 952. *See also Jones v. Wolf*, 443 U.S. at 606–10, 99 S.Ct. at 3027–29. The court stated that the presumption would be "defeasible upon a showing that the identity of the local church is to be determined by some other means." 668 P.2d at 952. It then examined the deeds, the articles of incorporation, the by-laws, and the canons and constitutions of PECUSA and of the diocese to determine whether these documents created an express trust in the church property in favor of PECUSA or the diocese. Concluding that no trust had been created and that statutorily required procedures had been followed by St. Mary's in voting to secede, the court of appeals held that the presumption of majority representation had not been rebutted and that judgment should be entered by the trial court "granting all real and personal property owned by the original St. Mary's Episcopal parish to the majority of the members of the original St. Mary's Episcopal parish." *Id.* at 954.

We consider it more consonant with a truly neutral analysis to consider first, without the application of any presumption, whether the instruments of conveyance, church documents and other relevant evidence establish that the general church has rights of ownership or control over the disputed church property by reason of a trust, a reverter clause, or some other basis. If, after applying neutral principles of law, such rights of ownership or control are determined to be vested in the general church, there will be no need to assess how property of the local church is controlled.[12] If, on the other hand, such an analysis results in a determination that ownership or control of the disputed property is vested in the local church, it then may be necessary to determine how control over that property is to be exercised. This is so because, as the United States Supreme Court recognized in *Jones v. Wolf*, determination of control of the local church in cases involving a dispute between contending groups within that church may be necessary to resolve internal differences con-

---

12. Ultimately, we determine that the case now before us does not require that we resolve how power over corporate property is to be exercised within St. Mary's Church. We believe it necessary to address the correctness of the court of appeals' adoption of a presumptive rule of majority representation, however, because it is an integral part of that court's neutral principles analysis.

cerning the use and disposition of the property of the local church.

However, we decline to adopt a presumptive rule of majority representation, or any other artificial presumption or rule, that must be applied in every case in which determination of control over property of a local church becomes necessary. Rather, we look for guidance to well-established principles of statutory and common law traditionally applied to determine who has legal control over any particular corporation or voluntary association and how freely or extensively that control can be exercised. We note, as one example, that a presumptive rule of majority representation would not be consistent with various provisions of the Colorado Nonprofit Corporation Act, such as the requirement in section 7–21–107(1)(b), 3 C.R.S. (1985 Supp.), that the articles of incorporation of a nonprofit corporation may be amended only when the proposed amendments receive at least two-thirds of the votes that corporation members are entitled to cast. A simple majority vote would not be legally sufficient.

2.

■ Additionally, and of more importance, in applying neutral principles analysis to the relevant evidence in this case, the court of appeals too narrowly restricted the scope of the permissible inquiry. When the court of appeals applied the neutral principles standard, the court reviewed the record only to determine whether the documentary evidence explicitly imposed an express trust over the property in favor of the general church. *Mote,* 668 P.2d at 953. Finding none, the court held that the majority presumption must apply. *Id.*

It is possible to view this approach to the neutral principles analysis as incorporating an unduly restrictive rule of evidence, *see Jones v. Wolf,* 443 U.S. at 610–21, 99 S.Ct. at 3029–34 (Powell, J., dissenting), precluding the trial courts from considering evidence relevant to a church property dispute that is not couched in the traditional forms and language of trust law. While it is not possible for us to delineate exactly the

scope of the inquiry that must be applied in every case of this type, there are several reasons why it is unnecessary for the civil courts to apply the neutral principles analysis in so narrow a manner.

First, a narrow inquiry is not constitutionally mandated. The majority in *Jones v. Wolf* noted that the states are free to adopt any of various approaches for settling church property disputes so long as the method chosen involves no resolution of doctrinal matters. 443 U.S. at 602, 608, 99 S.Ct. at 3024, 3028. Even if the majority opinion in *Jones* can be characterized as preferring a narrow, restrictive express trust version of the neutral principles analysis, there is no reason that Colorado must follow suit, as long as this court's analysis does not trespass into the forbidden area of resolving doctrinal issues. *Id.*

■ Second, the majority opinion in *Jones v. Wolf* discusses in general terms the need to rely on established concepts of trust and property law. *Id.* at 603, 604, 606, 99 S.Ct. at 3025, 3026, 3027. The Court did *not* restrict the inquiry to a search for explicit language of express trust. Colorado recognizes that the intent to create a trust can be inferred from the nature of property transactions, the circumstances surrounding the holding of and transfer of property, the particular documents or language employed, and the conduct of the parties. *See Ayres v. King,* 665 P.2d 594, 595 (Colo.1983); *Denver Chapter No. 145, Order of Ahepa v. Mile Hi City Chapter No. 360,* 171 Colo. 541, 547, 469 P.2d 740, 743 (1970); *Fleming & Pattridge v. Singer,* 168 Colo. 195, 200, 450 P.2d 635, 637 (1969); 1 A. Scott, *The Law of Trusts,* §§ 24, 25 (3rd Ed.1967). While such an inference is not to come easily—"[c]lear, explicit, definite, unequivocal and unambiguous language or conduct" establishing the intent to create a trust is required, *Morgan v. Wright,* 156 Colo. 411, 415, 399 P.2d 788, 790–91 (1965) (quoting 89 C.J.S., *Trusts,* § 45); *see also Matter of Estate. of Daniels,* 665 P.2d 594 at 595 (Colo.1983); *Fleming & Pattridge v. Singer,* 168 Colo. at 200, 450 P.2d at 637—no *particular* lan-

guage must be used to create a trust or to manifest the necessary intention to create a trust. *Noonan v. Stein,* 56 Colo. 64, 71, 136 P. 1181, 1183 (1913); *Sims v. Baker,* 30 Colo.App. 590, 597, 498 P.2d 960, 964 (1972); 1 A. Scott, *The Law of Trusts,* §§ 24, 25. There is no need to restrict the inquiry, as the court of appeals did in *Mote,* even if this court is searching only for evidence of a trust relationship. Moreover, other principles from the common and statutory law of property, contracts, corporations or voluntary associations might be the basis for a determination that a general church has a right, title or interest in the church property, requiring a more extensive inquiry.

■ Third, to say that the court may analyze only those provisions in the relevant documents that relate to control over the property in question, *see Jones v. Wolf,* 443 U.S. at 604, 99 S.Ct. at 3026, is but a truism reflecting the concept that only *relevant* evidence may be considered. This truism need not mean that a certain document or provision, obviously relevant to the determination of the parties' intent as to who will control the church property, cannot be considered solely because it does not relate exclusively to or contain the language of traditional property and trust law. If the evidence is competent and has probative value in resolving the central issue in dispute, it should be admitted and considered. *See People v. Lowe,* 660 P.2d 1261, 1264 (Colo.1983) (Colorado Rules of Evidence strongly favor the admission of evidence). A number of courts have considered documents not traditionally associated with trust and property law, or provisions in documents not solely couched in the traditional terms of trust and property law, as part of a neutral principles analysis.

*E.g., Hinkle Creek Friends Church v. Western Yearly Meeting of Friends Church,* 469 N.E.2d 40 (Ind.App.1984); *United Methodist Church v. St. Louis Crossing Independent Methodist Church,* 150 Ind.App. 574, 276 N.E.2d 916 (1971) (pre-*Jones*); *Fonken v. Community Church of Kamrar,* 339 N.W.2d 810 (Iowa 1983); *Fluker Community Church v. Hitchens,* 419 So.2d 445 (La.1982); *Presbytery of Elijah Parish Lovejoy v. Jaeggi,* 682 S.W.2d 465 (Mo.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 2361, 86 L.Ed.2d 262 (1985); *First Presbyterian Church of Schenectady v. United Presbyterian Church,* 62 N.Y.2d 110, 476 N.Y.S.2d 86, 464 N.E.2d 454, *cert. denied,* —— U.S. ——, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984); *Foss v. Dykstra,* 342 N.W.2d 220 (S.D.1983).[13]

■ Fourth, *Jones v. Wolf* does not require the civil courts to shy away from those documents, or provisions in documents, that intertwine religious concepts with matters otherwise relevant to the issue of who controls the property. As noted earlier, the neutral principles analysis as sanctioned by the United States Supreme Court includes the examination of church documents, i.e., the constitution and canons of the local and general church. *Jones v. Wolf,* 443 U.S. at 600–01, 603, 604, 99 S.Ct. at 3023–24, 3025, 3026; *Sharpsburg,* 396 U.S. at 367, 90 S.Ct. at 499. The civil courts are free to consider such documents. The only limitations are that the courts must not resolve church property disputes on the basis of religious doctrine and practice, *Jones v. Wolf,* 443 U.S. at 602, 99 S.Ct. at 3024, and therefore must defer to the church's authoritative resolution of any doctrinal issue necessarily involved in interpreting or applying the provisions of such

**13.** In *Dickey v. Snodgrass,* 673 P.2d 51 (Colo. App.1983), a panel of the court of appeals acknowledged that the court of appeals had adopted the neutral principles approach in *Mote* and in *Bernson v. Koch. Id.* at 52. In explaining the application of neutral principles analysis, the court did not confine the judicial function to searching the record exclusively for provisions of express trust in favor of the general church. Rather, the court stated generally:

On this basis [the neutral principles approach], a court can "determine ownership by studying deeds, reverter clauses, and general state corporation laws." *Bernson, supra.* Applying this analysis, we conclude that there is sufficient evidence in the record to support the trial court's determination that National, and therefore Investors, has no right, title, or interest in the property.
*Id.*

instruments, *id.* at 602, 604, 99 S.Ct. at 3024, 3026, if that resolution is brought to the court's attention in a manner clearly recognizable as a definitive resolution.

■ Fifth, and finally, if there is a schism in the local church and it is determined from the relevant evidence that a trust was not imposed on the disputed church property for the benefit of the general church—a determination made by the court of appeals in the present case—the required analysis is not at an end. As recognized in *Jones v. Wolf*, it then becomes necessary to pursue a further inquiry to determine how decisions concerning use of church property are made within the local church. 443 U.S. at 606–10, 99 S.Ct. at 3027–29. This inquiry can be as broad as is necessary to encompass all relevant considerations, as long as the inquiry does not require resolutions of disputed issues of religious doctrine. *Id.* at 608, 99 S.Ct. at 3028.

We have rejected the court of appeals' adoption of the presumptive rule of majority representation in favor of a more traditional and general inquiry as to the locus and nature of control in the local organization. The court of appeals' opinion, however, demonstrates that the court did not conduct *any* inquiry on this point. The court of appeals first determined that an express trust had not been created in favor of the general church and, therefore, that the local church corporation controlled the property to which it held the title. *Mote,* 668 P.2d at 953–54. It did not go further and examine the record to determine whether the secessionist majority controlled the corporation to the necessary extent to control the property. Rather, the court of appeals automatically assumed that a rule of majority representation operated to control the local corporation in all relevant respects. *Id.* For these reasons, even if we agreed with the court of appeals' conclusion that no trust was created in favor of the general church—but we do not—we would be compelled to conclude that its analysis of the issue of control within the local church organization was unduly restricted in scope and therefore fundamentally flawed.

## III.

Having articulated the proper legal standards for resolving church property disputes in general, we next apply those standards to the facts of the dispute before us.

### A.

■ One issue not addressed by the parties is whether we should remand this matter to the district court for application of the proper standards rather than definitively resolving the dispute as part of the present certiorari review. Support for a remand can be found in *Foss v. Dykstra,* 319 N.W.2d 499 (S.D.1982), in which the South Dakota Supreme Court held that the lower court erred by applying a polity approach rather than neutral principles to resolve a church property dispute and remanded the case with directions to the trial court to determine ownership by application of neutral principles. *Id.* at 500. *See also Foss v. Dykstra,* 342 N.W.2d 220 (S.D. 1983) (appeal after remand).

Although the court of appeals concluded here that the trial court erred in its choice of the legal analysis to apply to the facts, the court did not order a remand. In its view, resolution of the dispute at the appellate level was appropriate because all the relevant evidence is documentary and a remand would unnecessarily delay final resolution. *Mote,* 668 P.2d at 953 n. 2.

We do not agree with the court of appeals that all the competent and relevant evidence in this case is necessarily documentary. It may be, in the final analysis, that the evidence determinative of the dispute is limited to documentary evidence. However, much of the testimonial evidence concerning the interpretation of various documentary provisions and the historical relationship between the parish and the diocese has at least peripheral relevance and must be evaluated and weighed in arriving at a final resolution.

■ We do agree with the court of appeals, however, that a remand is not necessary here. In the district court, the plaintiffs presented evidence and argued legal theories not only of polity but also of trust and contract law. The defendants presented a defense based not only on their contention that a polity analysis would reveal that PECUSA was not hierarchical as to property matters, but also that a neutral principles analysis was preferable and would result in a finding that control over the property was in the local church majority. The trial court declined to address the plaintiff's alternative trust and contract theories because it decided to apply a polity analysis to the facts. There is absolutely no indication that the trial court's decision to apply a polity approach was fixed in advance of trial or that this decision limited the evidence presented or the evidentiary facts found in any significant way. Thus, a remand for an evidentiary hearing is not necessary to assure that an opportunity has been afforded for presentation of all evidence relevant to a neutral principles analysis.

Furthermore, many facts have been stipulated and the other relevant facts are not in dispute except for the ultimate finding and conclusion as to whether the facts found establish that a trust was imposed upon the local church property for the benefit of the general church. Because it chose to apply a polity analysis, the district court declined to make a finding on the trust issue; obviously, the parties are not in agreement on this matter.

Finally, all parties have presented argument in this court and in the court of appeals on the proper application of the neutral principles analysis to the facts of the dispute.

Given this record, we can as easily apply the legal principles to the facts as could the trial court, and doing so will likely save further appeals such as occurred in *Foss v. Dykstra*. In the interest of judicial economy, we elect to resolve this dispute in this opinion rather than ordering a remand.

### B.

■ Applying a neutral principles analysis to the facts, we conclude that the court of appeals erred when it held that the evidence does not show the imposition of a trust upon the real and personal property of St. Mary's in favor of the general church.[14]

---

**14.** The defendants argue that this court should not address the issue of whether an express trust in favor of the general church has been created because this legal theory was neither pleaded nor proved by the plaintiffs. The defendants claim that only an implied trust theory was invoked by the plaintiffs. The defendants are wrong, but clearing up a semantic problem is necessary to explain why. As one claim for relief in the third (and last) amended complaint, the plaintiffs outlined the facts generally as the trial court later found and stated that these facts established the imposition of a trust in favor of the general church on the local church property. In the prayer, the plaintiffs asked for a declaration that the church property was impressed with a trust in favor of the diocese and PECUSA. The plaintiffs likely chose this legal theory, along with alternative polity and contract theories, in part because of the court of appeals' statement in *Bernson v. Koch* that one of the analytical methods by which it may be found that a general church controls local church property is the use of trust theories purged of doctrinal overtones. 35 Colo.App. at 262, 534 P.2d at 337 (contrasted there with the "formal title" doctrine, *see* footnote 6, above). The

plaintiffs were aware of the fact that there was no document, or provision in a document, explicitly stating that the parish property was held in trust for PECUSA or for the diocese, and they so stipulated prior to trial. However, the plaintiffs argued that language in various provisions of the documents and the facts of the historical relationship between the local and general church implied the intent to create a trust in favor of the general church.

By labeling this legal theory as one of "implied trust," it seems apparent that the attorneys for the plaintiffs did not intend to use the term "implied trust" as it is sometimes used in Colorado—i.e., encompassing the equitable trust called a resulting trust or the remedy called a constructive trust that arise despite the lack of an intent to create a trust on the part of the grantor. *See Page v. Clark*, 197 Colo. 306, 592 P.2d 792 (1979). Rather, the plaintiffs were arguing for, in the want of a better term, an express trust created by implication in fact. As is noted in the text at pp. 100–101, the intent to create an express trust may be inferred from the nature of certain property transactions, the circumstances surrounding the holding of prop-

There can be no doubt that legal title to the disputed real property is held by St. Mary's Church, the nonprofit corporation created by the membership in 1934. The relevant deeds simply name the grantee as St. Mary's Church. There is no reference in the deeds to PECUSA or its Colorado diocese, and the deeds contain nothing to indicate that St. Mary's will hold these properties in trust for any person or body. Furthermore, the parties stipulated that the diocese "has not given or transferred real property" to St. Mary's, and the record indicates that the diocese never paid for the property or provided direct financial support to the parish for the acquisition of property.

The natural course of the inquiry then is to determine whether the plaintiffs have met their burden of presenting other evidence to establish that effective control over these properties is not reposed in the legal title holder, but rather that the local church property has been dedicated to the use and control of the general church. We conclude that an intent on the part of the local church corporation to dedicate its property irrevocably to the purposes of PECUSA was expressed unambiguously in the combination of the 1955 articles of incorporation, the local church bylaws, and the canons of the general church, to which the local church acceded in its articles at the time this dispute arose in 1976. This construction is reinforced by the conduct of the relevant officials of the local and general church.

The 1955 articles do not contain an explicit declaration of a trust in favor of the general church. Clause 1 of the articles, however, states in relevant part:

> The objects and purposes for which said Parish is incorporated are to administer the temporalities of the Protestant Episcopal Church in the Parish and to carry on and conduct religious, educational and benevolent institutions and works; to acquire by lease, purchase, gift or other-

wise, hold, use and enjoy, let, sell, mortgage, convey or otherwise dispose of, any and all real estate and personal property as may be determined by said corporation to be beneficial or useful in carrying out said purposes, and particularly to acquire, hold, use and enjoy all of the property, now held for the members of said church in the City and County of Denver, and State of Colorado. . . .

It was not disputed that the term "temporalities" referred, at least in part, to the real property of which the local church is the legal title holder. Clause 1 goes on to provide that "the corporation may not incur indebtedness which may alienate or encumber church property without the consent in writing of the Diocese of Colorado, a corporation, expressed by resolution of its Board of Trustee[s]." Clause 2 of the articles then provides

> The corporation now in existence by its Charter as herein amended does hereby expressly accede to all the provisions of the constitution and canons adopted by the General Convention of the Protestant Episcopal Church in the United States of America, and to all of the provisions of the constitution and canons of the Diocese of Colorado.

These two clauses, made part of St. Mary's basic organizational document, strongly indicate that the local church property was to be held for the benefit of the general church, and they show the extensive nature of the policy direction and property control to be exercised by the general church. There are no provisions in the articles implicitly or explicitly expressing an intent to the contrary. Furthermore, the parties stipulated that the "Rectors and vestry of St. Mary's Church have acknowledged their status as a local unit within the Episcopal Church and have accepted the benefits of that affiliation for more than 40 years." The parties further stipulated, or the trial court found, that the rector and members of St. Mary's have assumed an

erty, particular documents or language employed in the holding of property and/or the conduct of the parties. The plaintiffs have been

arguing from the beginning for an "express" trust result, although not explicitly labelled so.

active role in diocesan affairs, particularly by sending representatives to the annual conventions of the diocese and by accepting appointments to various permanent bodies and positions within the diocese, that the local church submitted to the diocese annual reports concerning rites, salaries and the value of property, and that the local church officials have sought the permission of the diocese before attempting to encumber parish property.

The corporate bylaws of St. Mary's Church contain little that is relevant to this dispute with the exception of article II, which provides:

The Church and Parish accede to the Constitution and Canons of The Protestant Episcopal Church in The United States of America, and the Ecclesiastical Authority and Canons of the Diocese of Colorado.

The parish shall have control of its own local affairs but nothing shall be done which conflicts with the Canons of the Church, either General or Diocesan.

An exercise of unbridled control over church property by the local church corporation would conflict with several provisions in the PECUSA and diocesan canons, which will be examined next along with the PECUSA and diocesan constitutions.

█ In 1976, the constitutions and canons of PECUSA and the diocese did not contain any provision explicitly recognizing a trust on parish property in favor of the

general church.[15] Our review of the PECUSA constitution discloses nothing that appears relevant to the dispute before us, other than the general description of the governing structure of the church. Certainly, the parties have not pointed to or offered into evidence any particular article of this constitution as relevant.

However, two sections of Canon 6 of Title 1 of the PECUSA canons are relevant in again showing the measure of control over local church property that is intended to be exercised by the general church. Section 3 provides:

No Vestry, Trustee, or other Body, authorized by Civil or Canon law to hold, manage, or administer real property for any Parish, Mission, Congregation, or Institution, shall encumber or alienate the same or any part thereof without the written consent of the Bishop and Standing Committee of the Diocese of which the Parish, Mission, Congregation, or Institution is a part, except under such regulations as may be prescribed by Canon of the Diocese.

Section 1(6) of that canon further provides that "[a]ll buildings and their contents shall be kept adequately insured."

█ Canon 12 of Title 1 of the PECUSA canons provides for the setting of parish boundaries and the formation of new parishes and provides that every congregation shall belong to the diocese in whose geographical area its place of worship is situ-

---

**15.** In September of 1979, PECUSA amended Title 1, Canon 6, of its canons to add a new section 4 providing the following:

All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject to this Church and its Constitution and Canons.

A new section 5 was also added to this canon at the same time, providing that "[t]he several Dioceses may, at their election, further confirm the trust declared under the foregoing Section 4

by appropriate action but no such action shall be necessary for the existence and validity of the trust." The plaintiffs argue that this clause merely confirmed the established customs, practices and usages within PECUSA. The New Jersey Supreme Court agrees. *Protestant Episcopal Church v. Graves*, 83 N.J. 572, 417 A.2d 19, 24 (1980), *cert. denied sub nom., Moore v. Protestant Episcopal Church*, 449 U.S. 1131, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981). Not surprisingly, the defendants argue that the new canonical provision created a trust over local church property in favor of the general church in 1979 where one did not exist before. As concerns the particular manner by which St. Mary's held property, we agree with the plaintiffs that the 1979 amendment did nothing but confirm the relationships existing among PECUSA, the diocese and the parish of St. Mary's.

ated. Section 3(c) of Canon 12 then provides that "[t]his Canon shall not affect the legal rights of property of any Parish or Congregation." The defendants freight this clause with ultimate meaning, i.e., as proof that all legal rights to property are held by the local church. But the limitation in section 3(c) itself to the narrow matters addressed in Canon 12 casts doubt on any attempt to give it expansive meaning, as do inconsistent provisions elsewhere within the canons of the general church and of the diocese.

Finally, section 2 of Canon 7, Title II, further indicates the control exercised by the general church over local church property, as it provides:

No dedicated and consecrated Church or Chapel shall be removed, taken down, or otherwise disposed of for any worldly or common use, without the previous consent of the Bishop, acting with the advice and consent of the Standing Committee of the Diocese.

Although the parties included the constitution of the Diocese of Colorado in the record, no part of this constitution was offered into evidence or discussed by the parties. Only article XVI appears to be of possible relevance, as it provides that "[a]ll real property of The Church" within the diocese not held by parishes and "all personal property of The Church" not held by parishes and missions "shall be Diocesan property." We deem this article of little significance for our purposes here, however, as it is ambiguous as regards the problem presented and neither the plaintiffs nor the defendants argue that it is relevant.

■ The canons of the diocese do contain various provisions of relevance. Canon 17 concerns the organization and governance of parishes. Section 3 of this canon requires that every parish adopt a resolution "acceding to the Constitution and Canons of The Church and to the Constitution and Canons of the Diocese of Colorado, and promising conformity to the Doctrine, Discipline and Worship of The Church." As noted above, St. Mary's placed such a provision in its articles of incorporation and in its bylaws. Section 8 further provides:

No Parish shall file Articles of Incorporation as provided by the State of Colorado unless such Articles of Incorporation be in accord with and accede expressly to the Constitution and Canons adopted by The General Convention of The Church and to the Constitution and Canons of the Diocese of Colorado, and shall have received first the written approval of the Bishop and the Chancellor or Vice-Chancellor of the Diocese. No Parish shall amend its Articles of Incorporation without the written consent of the Bishop and the Chancellor or Vice-Chancellor of the Diocese.

Finally, Section 7 of the same canon relates directly to parish property, and provides:

Every Parish shall have control of its own local affairs, but no Parish shall incur an indebtedness which may alienate or encumber Church property without the written consent of the Diocesan Executive Council, nor may it encumber nor alienate any consecrated Church or Chapel, or any Church or Chapel which has been used solely for Divine Service without additionally obtaining the consent of the Standing Committee of the Diocese.

The trial court found that when the parish sought to burden its real property in connection with construction loans or purchases of other property in 1956, 1963, 1973 and 1976, the parish submitted formal applications for consent to encumber to the Board of Trustees of the Diocese or to the Board's successor entity, the Diocesan Executive Council, "the tribunal having general charge of property and financial matters." In 1968, an encumbrance "may have been incurred" without a request for consent, "but this was apparently not done with any intent to defy or disobey the Diocese."

Next, canons 18 and 21, although not formally offered into evidence, are obviously relevant and were placed in the record by the parties. Canon 18 provides for the dissolution of parishes. Section 1 provides

that "[w]hen a Parish has ceased to support its Rector," the Bishop may dissolve the parish. Section 2 provides that upon dissolution "the title to all of its property, both real and personal, shall vest automatically and forthwith in the Diocesan Corporation known as The Bishop and Diocese of Colorado." Section 3 further provides that upon dissolution of a parish, the local corporation dissolves automatically. Obviously, a dissolution of St. Mary's parish has not taken place. This canon, however, does establish that the parish property is not intended by the general church to leave the diocese and that the general church has the authority to implement that intention. The canon is sufficient, in concert with the other provisions, to demonstrate the irrevocable nature of the dedication of property by the local church corporation for the purpose of advancing the work of PECUSA.

Diocesan canon 21 concerns the use of church buildings and provides:

Church buildings, Chapels or houses of worship belonging to any Parish, Mission or Institution of the Church within the boundaries of the Diocese of Colorado may be opened for all Services, Rites, Ceremonies or other purposes authorized or sanctioned by The Church in the United States of America or by the Bishop Ordinary, and for none other purposes, at such times as the Priest in charge may deem proper or, if there be no Priest in charge, as the Bishop having jurisdiction may direct.

Again, this canon is another strong example of the control over property ceded by the local church to the diocese and is further indicative of the intent of the local and the general church to maintain integrity in the ownership and use of property at the parish level for PECUSA purposes. Furthermore, based on the testimony of the Bishop, the trial court found that, among other powers, the Bishop had the authority to visit congregations in the diocese for the purpose "of inspecting the behavior of their clergy and of examining their general physical and financial condition." The court also found that the defendants did not contradict the Bishop's description "of

the actual operation and exercise of authority within the Diocese ... as to property and financial matters."

Finally, Section 1 of Canon 12 provides for the Diocesan Executive Council and generally outlines the council's duties and powers. Specifically relevant to this dispute is the council's duty to direct the "carrying out of the programs and policies for the Diocese as adopted by the Annual Diocesan Convention." This canon does not expressly authorize the council to control parish property or preclude the council from controlling parish property; it does appear to provide the council with general authority sufficient to administer parish property to the extent that control is authorized by other provisions or documents.

██ Little of relevance to this particular issue can be found in the Colorado statutes. A few states have statutes governing the holding of or control over real property formally held by a local church that is part of a hierarchical church. For example, *see Presbytery of Beaver-Butler v. Middlesex Presbyterian Church*, 80 Pa. Cmwlth. 211, 471 A.2d 1271, 1276–77, 1279 (1984) (polity approach essentially codified in Pa. Act of 1935), *reversed*, 507 Pa. 255, 489 A.2d 1317, *cert. denied*, —— U.S. ——, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985). Colorado has no such statute.

Prior to 1968, Colorado statutes made explicit provision for the incorporation of religious societies, including churches. *See* §§ 7–50–101 to –114, 3 C.R.S. (1973 & 1985 Supp.). Nothing in article 50, or its predecessors, indicated who was to control church property in the event of a dispute between a local church and its general church. The provisions of article 50 do not apply to any religious society formed after December 31, 1967, or to any religious corporation formed prior to January 1, 1968, "which has elected to accept the provisions of articles 20 to 29 of this title [the Colorado Nonprofit Corporation Act]." § 7–50–101(2), 3 C.R.S. (1973). As noted in footnote 2 of this opinion, St. Mary's Church was incorporated prior to 1968 under the forerunner of article 50, but opted to be

governed by the provisions of the Colorado Nonprofit Corporation Act, as permitted by section 7–50–101(2), on April 30, 1976. This was approximately six months before the local schism. Thus, the provisions of the Colorado Nonprofit Corporation Act governed the operations of St. Mary's Church at the time this dispute arose. Again, however, there is nothing in the Colorado Nonprofit Corporation Act that either requires the local corporation to hold its property in trust for the general church or prohibits such action, or that in any way provides support for or detracts from the plaintiffs' argument that the local church corporation, the legal title holder, does not control the local church property.

In summary, St. Mary's articles of incorporation and bylaws, along with relevant provisions in the canons of the general church, demonstrate a unity of purpose on the part of the parish and of the general church reflecting the intent that property held by the parish would be dedicated to and utilized for the advancement of the work of PECUSA. These provisions foreclose the possibility of the withdrawal of property from the parish simply because a majority of the members of the parish decide to end their association with PECUSA. We hold that the facts specifically found by the trial court or otherwise uncontroverted establish that a trust has been imposed upon the real and personal property of St. Mary's Church for the use of the general church.[16] There is no question but that the utilization of the property by those members of St. Mary's who desire to remain affiliated with PECUSA under diocesan direction is in furtherance of that use.

There has been only one other reported decision in which a neutral principles analysis was applied to resolve a similar church property dispute arising from a schism in a local PECUSA church, *Protestant Episcopal Church in the Diocese of Los Angeles v. Barker*, 115 Cal.App.3d 599, 171 Cal. Rptr. 541, *cert. denied*, 454 U.S. 864, 102 S.Ct. 323, 70 L.Ed.2d 163 (1981). In *Barker*, a panel of the California Court of Appeals concluded, after reviewing articles of incorporation and church canons, that a trust had not been imposed on the property of three different parishes for the benefit of the general church, and that no other principle of real property, contract or trust law operated to strip these local churches of control over the property to which they held legal title. 171 Cal.Rptr. at 552–55.

A fourth PECUSA parish, however, the Holy Apostles Church, was found to have imposed an express trust upon its property in favor of the general church. *Id.* at 554–55, 555–56. One distinction between the Holy Apostles Church and the other three found significant by the court was that the articles of incorporation of the Holy Apostles Church specified that upon dissolution, liquidation or abandonment of the local church, the local church property would inure to the benefit of a charitable fund operated by the diocese. *Id.* The statute under which the local church was organized as a subordinate body of the general church also provided that upon revocation of the local church charter by the general church the local church was to deliver its property to the general church. The California court held that the local church's disaffiliation and secession from the general church was the equivalent of a revocation of its charter, that the result was constructive dissolution of the local church, and that its property reverted to the general church under the provisions of the statute and the articles of incorporation of the local church. *Id.* at 556. In the present case, an analogous dissolution/reversion provision appears in canon 18 of the canons of the Diocese of Colorado. Al-

---

**16.** Our decision is in accord with the holding of the court of appeals in *St. Paul's Episcopal Church*, based upon nearly identical facts. We recognize that the decision of the court of appeals in *St. Paul's Episcopal Church* was not selected for official publication and, therefore, has no value as precedent in the courts of the state. *See* C.A.R. 35(f). However, the decisions of the court of appeals in *Mote* and *St. Paul's Episcopal Church*, decided within a two-year span, subjected PECUSA and its Colorado diocese to apparently inconsistent and conflicting decisions concerning rights in parish property. For that reason, we feel compelled to give due consideration to the holding and analysis in *St. Paul's Episcopal Church* as well as the holding and analysis in *Mote*, the case on review.

though the articles of incorporation of St. Mary's Church do not expressly incorporate this canon, those articles do contain the general provision that St. Mary's accedes to the canons of the diocese. While we do not agree that the equivalent of dissolution has occurred when a local church attempts to disaffiliate, we do agree that this provision indicates the nature and extent of the control over real and personal property by the diocese and the intent of all concerned that the property remain within the diocese.[17]

On facts similar to those now before us, other courts have found a trust relationship or some other legal relationship divesting the local church of control of its property based upon a neutral principles analysis. *Crumbley v. Solomon*, 243 Ga. 343, 254 S.E.2d 330 (1979) (per curiam) (Holiness Baptist Association); *Carnes v. Smith*, 236 Ga. 30, 222 S.E.2d 322, *cert. denied*, 429 U.S. 868, 97 S.Ct. 180, 50 L.Ed.2d 148 (1976) (United Methodist Church); *United Methodist Church v. St. Louis Crossing Independent Methodist Church*, 150 Ind. App. 574, 276 N.E.2d 916 (1971) (United Methodist Church); *Fonken v. Community Church of Kamrar*, 339 N.W.2d 810 (Iowa 1983) (Presbyterian Church—utilizing both a polity and a neutral principles analysis); *Fluker Community Church v. Hitchens*, 419 So.2d 445 (La.1982) (African Methodist Episcopal Church); *Babcock Memorial Presbyterian Church v. Presbytery of Baltimore*, 296 Md. 573, 464 A.2d 1008 (1983), *cert. denied*, 1027 U.S. 465, 104 S.Ct. 1287, 79 L.Ed.2d 689 (1984) (Presbyterian Church—utilizing both a polity and a

neutral principles analysis); *Protestant Episcopal Church v. Graves*, 83 N.J. 572, 417 A.2d 19 (1980), *cert. denied sub nom. Moore v. Protestant Episcopal Church*, 449 U.S. 1131, 101 S.Ct. 954, 67 L.Ed.2d 119 (1981) (PECUSA—utilizing a polity analysis but noting that a neutral principles analysis would produce the same result); *Fairmount Presbyterian Church, Inc. v. Presbytery of Holston*, 531 S.W.2d 301 (Tenn. App.), *cert. denied* (Tenn.1975) (Presbyterian Church). As well, other courts have applied a neutral principles analysis to more or less similar facts and have *not* found a trust relationship. *E.g., Presbytery of Riverside v. Community Church of Palm Springs*, 89 Cal.App.3d 910, 152 Cal.Rptr. 854 (Cal.App.), *cert. denied*, 444 U.S. 974, 100 S.Ct. 469, 62 L.Ed.2d 389 (1979) (Presbyterian Church); *Coles v. Wilburn*, 241 Ga. 322, 245 S.E.2d 273 (1978) (per curiam) (Christian Methodist Episcopal Church); *York v. First Presbyterian Church of Anna*, 130 Ill.App.3d 611, 85 Ill.Dec. 756, 474 N.E.2d 716 (1984), *cert. denied*, — U.S. —, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985) (Presbyterian Church); *Presbytery of Elijah Parish Lovejoy v. Jaeggi*, 682 S.W.2d 465 (Mo.1984), *cert. denied*, — U.S. —, 105 S.Ct. 2361, 86 L.Ed.2d 262 (1985) (Presbyterian Church); *First Presbyterian Church of Schenectady v. United Presbyterian Church*, 62 N.Y.2d 110, 476 N.Y.S.2d 86, 464 N.E.2d 454, *cert. denied*, — U.S. —, 105 S.Ct. 514, 83 L.Ed.2d 404 (1984) (Presbyterian Church); *Presbytery of Beaver-Butler v. Middlesex Presbyterian Church*, 507 Pa. 255, 489 A.2d 1317, *cert. denied*, — U.S.

---

**17.** We recognize that a similar "dissolution" provision was in the Canons of the Diocese of Los Angeles at the time of the dispute in *Barker*, and that the three parishes (other than Holy Apostles Church) had provisions in their articles of incorporation acceding to the diocesan canons, 171 Cal.Rptr. at 544–46, yet the California Court of Appeals held that these provisions did not preclude these three parishes from disaffiliating and withdrawing their property from PECUSA, *id.* at 554–55. The court noted that at the time the articles of incorporation of the three parishes were adopted, the diocesan canons did *not* include the "dissolution" provision. *Id.* at 554. The court concluded that the general accession provisions were "nothing more than expressions

of present intention" that were not intended to be open-ended agreements to accept all rules and regulations subsequently adopted by the general church, were not "restrictive of future amendments to the articles," and did not create an express trust over the property of the local church in favor of the general church. *Id.* On the record before us, including the fact that nothing in the record indicates that the canons of the Diocese of Colorado did not include the "dissolution" provision, Canon 18, when the articles of incorporation of St. Mary's were adopted in 1934 or amended in 1955, we find the holding in *Barker* inapplicable and decline to follow it.

——, 106 S.Ct. 198, 88 L.Ed.2d 167 (1985) (Presbyterian Church); *Foss v. Dykstra,* 342 N.W.2d 220 (S.D.1983) (Presbyterian Church). Our review of these cases and of other of the myriad decisions from the courts of this nation involving church property disputes persuades us of the correctness of our conclusion that, on these particular facts, a trust has been imposed on the real and personal property held by St. Mary's Church for the use of the general church.[18]

### IV.

We reverse the judgment of the court of appeals and remand this case to that court with directions to return it to the district court for entry of judgment in favor of the plaintiffs consistent with the views expressed in this opinion and for a determination of any further relief that may be appropriate.

KIRSHBAUM, J., does not participate.

---

18. In their petition for certiorari, the plaintiffs argued that the adoption of the neutral principles analysis by the court of appeals and the application of that analysis to find the control over the church property to be in the secessionist majority constituted an unconstitutional retroactive application of new law that deprived the plaintiffs of their established property rights. We granted certiorari to review that issue. However, because of our resolution of the case, we find it unnecessary to address the retroactivity question as the plaintiffs are no longer adversely affected by the application of the neutral principles analysis.